UNITED STATES of America,

v.

John W. HINCKLEY, Jr.,
Defendant/Petitioner.

Criminal No. 81–0306(JLG).

United States District Court,
District of Columbia.

June 19, 1997.

Robert R. Chapman, Thomas E. Zeno, Assistant United States Attorneys, Washington, DC, for Plaintiff.

Barry Wm. Levine, John T. Kotelly, Dickstein, Shapiro & Morin, Washington, DC, Janet Maher, Assistant Corporation Counsel, Washington, DC, for Defendant.

## *MEMORANDUM*

JUNE L. GREEN, District Judge.

Before the Court is the Petitioner, John W. Hinckley, Jr.'s, Motion for Conditional Release and to Vacate "Stipulated" Order Dated April 24, 1987, pursuant to Title 24 D.C.Code § 24–301(k). The Government has filed an opposition to this motion. An evidentiary hearing on the requested relief was held on June 9, 10, 11 and 12, 1997. Pursuant to the evidence presented to the Court and based upon the findings of fact that follow, the Court concludes that John W. Hinckley, Jr. continues to present a danger to himself or others and that his motion must, therefore, be denied.

**BACKGROUND**

In 1981, in a failed assassination attempt, Petitioner shot and wounded four individuals including then-President of the United States, Ronald Reagan. At his criminal trial, Petitioner presented evidence that he was suffering from a mental disease and that his criminal actions were the result of such disease. Petitioner was acquitted of the charges brought against him by reason of insanity and, following his trial, committed to St. Elizabeths Hospital ("the Hospital") where he has remained since June 21, 1982.

In the nearly sixteen years since his commitment began, Petitioner has at various times sought some form of release from the Court pursuant to D.C.Code § 24–301(k). Each time, Petitioner's request was either denied or withdrawn.[1] Moreover, requests by the Hospital in 1987 and 1988 that Mr. Hinckley be released into the community under the supervision of Hospital staff were also withdrawn. *See* Letter from Prescott to United States District Court of 4/15/87; Withdrawal in open court at hearing of 8/12/88.

In the motion at issue here, Petitioner asks the Court to release him into the community in the care of his parents, but otherwise unsupervised, for twelve hours each month. Petitioner also asks that a stipulation entered in 1987 requiring that the Hospital give two-weeks notice to the Court and to the United States Attorney's Office prior to any supervised excursions off the grounds of the Hospital be vacated.

Beginning June 9, 1997, the Court received evidence during a four-day evidentiary hearing. The Petitioner presented five witnesses including four experts: two psychologists, Drs. Kirk S. Heilbrun and R. Mark Binderman; and two psychiatrists, Drs. William T. Carpenter and John J. Kelley. The Petitioner's father, John Hinckley, Sr. also testified. The Government, for its part, offered the testimony of a fact witness, Cmdr. Jeanette Wick, as well as its own expert psychiatrist, Dr. Raymond F. Patterson.

---

1. Two motions were denied by Judge Barrington D. Parker (*see* Order dated March 27, 1986), and a third, filed in 1992, was withdrawn by the Petitioner. *See* Petitioner's Withdrawal of Motion for Conditional Release, dated April 2, 1993.

## DISCUSSION

### *Standard of Review*

 As a motion for conditional release made pursuant to D.C.Code § 24–301(k), the Court is required to make findings of fact and conclusions of law with regard to whether the proposed release will benefit the patient and be safe for the public. *United States v. Ecker, II,* 543 F.2d 178, 191 (D.C.Cir.1976). In order for the Petitioner to be successful, the Court must, after weighing all of the evidence, find (by a preponderance of the evidence) that the Petitioner "will not, in the reasonable future, endanger himself or others." *Id.* at 187. The Court in *Ecker II* noted that it is not "sufficient for the district court merely to find that the patient 'is no longer likely to injure himself or other persons because of mental illness.'" *Id.* The Court must make an "affirmative finding that it is at least more probable than not that [Petitioner] will not be violently dangerous in the future." *Id.*

 In receiving and weighing the evidence, the Court is not bound to accept the opinion of any expert witness but is free to consider other evidence including "the patient's hospital file, the court files and records in the case, and whatever illumination is provided by counsel." *Id.* at 184–185.

In examining the evidence here, the Court notes that the request for conditional release has not come from the Hospital, but from the Petitioner and that the Hospital has, in fact, denied a similar request made by the Petitioner. Such a posture makes an exacting review of the evidence that much more important.

### *Experts Offered by the Petitioner*

Petitioner's experts were in substantial agreement concerning Mr. Hinckley's current diagnosis: that is, that Petitioner suffers from psychotic disorder not otherwise specified, in remission; major depression, in remission; and, narcissistic personality disorder.[2] The opinions of the Petitioner's experts essentially are that Petitioner would present a very low risk of danger to himself or others should his request for conditional release be granted. Tr. 31, 177, 218, 290. These opinions were based upon the results of psychological testing, interviews with Hospital staff, and review of medical records. Tr. 31, 177. These experts also agreed, for the most part, that Petitioner's prior active mental illness was such that any symptomatic recurrence would likely progress over a period of time longer than the twelve hours involved in the requested monthly excursions. Tr. 77–78, 283. This is significant, they reasoned, because any symptoms would, therefore, be detectable in advance of an unescorted visit. *Id.*

### *Fact Witness Offered by the Government—Cmdr. Jeanette Wick*

Following the close of the Petitioner's case, the Government offered the testimony of Cmdr. Jeanette Wick, Chief Pharmacist at the Hospital. Cmdr. Wick testified regarding her relationship with the Petitioner. She stated that she first became personally acquainted with the Petitioner when she offered to lend him a book in late February or early March of 1995. Tr. 504, 506. Cmdr. Wick stated that Mr. Hinckley began to visit her office fairly frequently and that these visits were unannounced. Tr. 504. During these visits, Cmdr. Wick stated that Petitioner would talk about books that he was reading or wanted to read. *Id.* Cmdr. Wick also testified that on these occasions, Petitioner asked her advice on whether she thought he should be interviewed by Barbara Walters and gave her audio tapes of music he had recorded, including one "love song" containing the pet name of her daughter. Tr. 515. Even more disturbing to Cmdr. Wick was her discovery that the Petitioner had been gathering information about her after-hours personal schedule with her daughter. Tr. 512.

Cmdr. Wick stated that their relationship progressed in this way (about three weeks) until she was taken aside by her staff and told that they believed she was spending too much time with the Petitioner. Tr. 507.

---

**2.** Dr. Carpenter's diagnosis varied slightly in that he characterized Petitioner's psychosis as schizophrenia. Tr. 278.

Cmdr. Wick testified that she then told Petitioner that he could not come to her office without calling first. Tr. 514. When this proved unsuccessful, she spoke to Petitioner a second time following a fire drill and told him the same thing. Tr. 518. The result was that the Pharmacy began to receive repeated hang up calls on a daily basis. Tr. 519. When Cmdr. Wick answered the phone, however, the Petitioner would identify himself as the caller. *Id.* Cmdr. Wick testified that she reported these problems to Dr. Maureen Christian and then began to avoid Petitioner completely. Tr. 520. These efforts were mostly successful.

In September of 1995, however, Cmdr. Wick testified that she filed an Incident Report because Petitioner had disobeyed a directive that he not deliver a package to her. Tr. 523–525. An investigation followed and Petitioner was given three restrictions: 1) Petitioner was not to go in the general vicinity of the building in which Jeanette Wick worked; 2) Petitioner must limit his contact with Jeanette Wick solely to business and there could be no social relationship; and, 3) whenever he planned to use his grounds privileges he must first speak to some member of the treatment team and indicate what he was going to do and where he was going to be. Tr. 400.

In response to a question regarding whether she has had contact with the Petitioner in the wake of the Incident Report and the subsequent investigation, Cmdr. Wick testified that she encounters the Petitioner on the third Monday of each month because of her attendance at a committee meeting in the Acute Care Hospital and that Petitioner is frequently standing in the lobby when she arrives. Tr. 528. Asked to describe the encounter, Cmdr. Wick testified regarding one example occurring in March 1996: "[Petitioner] glares at me. He stares at me. I guess the kids would say, he stares me down." *Id.* She added: "I went to the elevator, and as I went to the elevator, [Petitioner] re-situated himself so he could keep me in his line of vision apparently."

The Court credits Cmdr. Wick's testimony. In addition to a demeanor that suggests a high degree of credibility, the Petitioner has failed to directly rebut any of her testimony. Further, the testimony offered by the Petitioner of Dr. Kelley and his investigation into the so called "Wick Incident" does not, in the Court's view, indirectly rebut Cmdr. Wick's testimony.

### Expert Offered by the Government

The Government offered only one expert witness: Dr. Raymond F. Patterson. Dr. Patterson's diagnosis of the Petitioner does not vary from that of Petitioner's experts or the Hospital's diagnosis. He too believes that Petitioner's major illnesses, psychotic disorder not otherwise specified and major depression, are in remission. Tr. 577. Dr. Patterson, however, does not concur with Petitioner's experts that Petitioner will not be dangerous to himself or others in the reasonable future if allowed unaccompanied visits with his parents. Tr. 578. What is compelling to the Court are Dr. Patterson's reasons for his opinion. As Dr. Patterson testified:

> **The Witness:** The last time Mr. Hinckley was in the Community, unattended or unsupervised, the risk of dangerousness was extremely high. That was 16 years ago. Therefore, you have to consider *past history* and what factors went into his having committed that offense, and his subsequent improvement as observed by hospital staff and as reported by himself and by others, and the psychological testing that demonstrates some improvements in some areas and *some concerns that some very core personality issues remain unchanged.*

Tr. 579. Dr. Patterson also based his opinion on Petitioner's recent relationship with a pharmacist at the Hospital, Cmdr. Jeanette Wick. Dr. Patterson stated that Petitioner's relationship with Cmdr. Wick bore some "striking similarities to the 'relationship' ... that he had with Ms. Foster." Tr. 580. One of the similarities mentioned by Dr. Patterson is Cmdr. Wick's feeling that she was at times "stalked" by the Petitioner. Tr. 582. Other similarities described by Dr. Patterson (direct or indirect) include numerous telephone calls by Petitioner to Cmdr. Wick; numerous visits to Cmdr. Wick's office and those visits eventually becoming unwelcome; Cmdr. Wick's filing of an incident report

when Petitioner disobeyed her directive not to deliver a personal package; Petitioner's having personal information about Cmdr. Wick and eavesdropping on personal calls; and, audiotapes of love songs Petitioner made and gave to Cmdr. Wick. Tr. 581.

Dr. Patterson describes the "stalking" parallel as significant because of Petitioner's history of stalking individuals including President Carter, President Reagan and Jodie Foster. Tr. 585. Dr. Patterson described such stalking as eventually leading to the Petitioner's assassination attempt on President Reagan. *Id.*

Although Dr. Patterson does not suggest that the relationship with Cmdr. Wick reached delusional proportions, it did raise questions with him regarding whether Petitioner became obsessively infatuated with her. Tr. 582.

Most important to the Court, however, is Dr. Patterson's account of Petitioner's past and continued propensity for deception and secretiveness, especially to those responsible for treating him. Dr. Patterson found it significant that Petitioner's treatment team had no idea about the relationship between Petitioner and Cmdr. Wick until September of 1995, nearly six months after it began. Tr. 581. Dr. Patterson found this to be consistent with Petitioner's history and the initial failure of several mental health professionals, prior to the shooting of President Reagan, to detect Petitioner's psychosis; and the failure of the Hospital in the years since his commitment to detect continuing symptoms of Petitioner's mental illness. Tr. 586. As Dr. Patterson testified:

> There have been in the Mid '80's, let's say in '83 to '88, a number of situations where Mr. Hinckley has not told people that are his treaters what he's actually thinking or doing. They relate to collecting pictures of Jodie Foster. They relate to requesting a nude caricature of Jodie Foster. Even up into the day before a hearing on the matter, Mr. Hinckley stating that it had no sexual content, was not nude.
>
> They relate to his writing Ted Bundy, his writings about Adolf Hitler, Charles Manson. And none of his treaters knew that from Mr. Hinckley telling them until

he was confronted with it by third parties revealing that information to Hospital staff.

> ... So, Mr. Hinckley many times has looked on the surface to be doing pretty well, and compared to many of the patients at the Hospital who do have trouble, who may get into fights or may get into disruptive activities, Mr. Hinckley doesn't do that.

Tr. 587.

Still another instance Dr. Patterson cites of Petitioner keeping matters from those treating him include his more recent failure to disclose a possible interview with Barbara Walters (something he discussed with Cmdr. Wick) in which he would be given the opportunity to play his music. Tr. 589. Dr. Patterson stated that this is significant because Petitioner has told numerous clinicians and others that he no longer has any interest in media exposure. Tr. 593.

In addition to these factors, Dr. Patterson also bases his opinion on the results of psychological testing which indicates that the Petitioner continues to be "very defensive and represses a lot of his feelings." Tr. 588.

### FINDINGS OF FACT

Based upon the testimony and documents submitted by the Government and counsel for the Petitioner, the Court makes the following findings of fact:

1. Petitioner's current diagnosis is psychotic disorder not otherwise specified, in remission; major depression, in remission; and, narcissistic personality disorder.

2. Petitioner has a history of deception and a record of screening information he is otherwise obligated to provide to treating and examining clinicians. Counsel for the Petitioner has stipulated to everything that occurred during the 1980's with regard to the Petitioner. Tr. 156. Most recently Mr. Hinckley failed to disclose a relationship he was pursuing with Cmdr. Jeanette Wick or to advise his treatment team that he was considering an opportunity to appear on the Barbara Walters show to give an interview and a musical performance.

3. As recently as March 1995–March 1996, Petitioner has engaged in conduct with the Chief Pharmacist at the Hospital, Jeanette Wick, that has disturbing parallels to the conduct leading up to the shooting of President Reagan including the stalking of President Carter and Jodie Foster. These parallels include continued pursuit of a personal relationship with Cmdr. Wick even after it became clear that she was not interested, making unannounced visits to her office when told not to do so by her, making numerous telephone calls and, on some occasions, identifying himself only when Cmdr. Wick answered the phone, gathering information about her after-hours personal schedule, recording love songs for her and using the pet name of her daughter in one of the songs, and staring at her in a menacing fashion more than eight months after he was told to avoid her by Hospital Staff. The Court finds such parallels to be significant to the Petitioner's current mental condition and his pending request.

4. The psychological testing results indicate that Petitioner has made progress but continues to be "very defensive and represses a lot of his feelings." Tr. 588.

## CONCLUSIONS OF LAW

### Request for Twelve–Hour–per–Month Unsupervised Visits

■ The Court credits Dr. Patterson's testimony over the testimony of Petitioner's experts with regard to the ultimate opinion of whether Petitioner would present a danger to himself or others should his request for conditional release be granted. In so concluding, the Court notes that Dr. Patterson's conclusions and the approach he takes emphasize the concerns most important to the Court: that is, Petitioner's history of deception and propensity to withhold information from those treating him. Although Petitioner's experts and his counsel emphasize the progress Petitioner has made, especially in the 1990's, the Court does not view such an assessment in a vacuum. His current status must be measured against the entire history of this case.

The history of this case suggests a deceptive individual who has, in the past, deceived those treating him in ways too numerous to recount. That history makes it even more incumbent upon the Petitioner to be especially forthright and open with his current treatment clinicians. Unfortunately, the evidence suggests that Petitioner has behaved otherwise. The Court is referring to the relationship with Cmdr. Wick and Petitioner's statements to her concerning the possibility of appearing on television with Barbara Walters when he had all but convinced his treatment team that he had foresworn any desire for media attention. Although such transgressions are seemingly trivial, the Court does not think so, especially when measured against his past.

Moreover, in considering the opinions of his experts, the Court is reminded of a journal entry made by Mr. Hinckley in 1987 in which he wrote:

I dare say that not one psychiatrist who has analyzed me knows any more about me than the average person on the street who has read about me in the newspapers. Psychiatry is a guessing game and I do my best to keep the fools guessing about me. They will never know the true John Hinckley. Only I fully understand myself.

Tr. 156–157; (stipulated to by counsel for Petitioner). What is particularly disturbing is that this statement was written at a time when the Petitioner had already undergone five years of treatment and had convinced his treatment clinicians that he had recovered sufficiently for conditional release. Statements such as these cause the Court to proceed carefully in weighing current assessments of the Petitioner by his experts.

■ With regard to the testimony by Petitioner's experts that Petitioner's mental disease is such that any symptomatic recurrence of his psychosis would evolve over a longer period of time than the twelve hours of a monthly visit, the Court is not convinced. One of the Petitioner's experts, Dr. Heilbrun, gave examples of what to look for as indications that Petitioner is "decompensating" including withdrawing from social groups and relationships, not attending therapy, attempting contact with Jodie Foster or the media, and thoughts of suicide. Tr. 75–77. While such apparent indications would certainly

raise a red flag to treatment team members, the reality of Petitioner's history has been very different. The Court is not convinced that the indicators listed by Dr. Heilbrun are in any way exhaustive, and, given both the ability and the propensity of the Petitioner to deceive his treatment providers, the Court can easily envision instances where Petitioner is able to withhold important information that could indicate a relapse. The so-called "Wick Incident" comes immediately to mind.

It is also noteworthy that even the expert witnesses in this case who support conditional release are in substantial agreement that patients at the Hospital usually are granted "B–City" privileges (escorted trips into the community) prior to unsupervised conditional release. Tr. 291.

Based upon all of the evidence presented and the history of this case, the Court concludes that the Petitioner has failed to meet his burden that he will not be a danger to himself or others should he be permitted monthly twelve-hour unescorted visits with his parents off Hospital grounds. The severity of the Petitioner's criminal conduct, and his conduct at the Hospital since his admission in 1982, as well as his current behavior, all militate against the conditional release he seeks.

### Request to Vacate the Stipulated Order Dated April 24, 1987 [3]

■ The Petitioner requests that a stipulated Order between the Hospital and the Government be vacated because, as a practical matter, it acts to prevent Petitioner from being taken on supervised excursions into the community. Such privileges are referred to as "B–City" privileges. The reason for this, Petitioner argues, is that the Order requires that notice be given to the Court and the United States Attorney's Office two weeks in advance, but that the Hospital does not even plan such community excursions that far in advance.

■ The Petitioner's request is denied. As an initial matter it appears that Petitioner's request is moot. Apparently, the Hospital has not extended "B–City" privileges to the Petitioner, so the notice requirement is not even an issue at this stage.

Even if this were not the case, however, the Court would not vacate its Order. The Court wishes to be apprised of any attempts to bring the Petitioner into the community and the terms of any such proposal (number of staff on hand, nature of excursion, size of group). The Court is surprised to hear that the Hospital cannot plan such trips more than two weeks in advance and has been presented no evidence to this effect. In fact, given the nature of this case, the Court would think that two weeks is the minimum amount of time needed to plan any such excursion.

With regard to Petitioner's concern that the notice requirement would trigger a public hearing wherein it would become known by members of the public and media the proposed location of the excursion, the Court does not find that this would act as an impediment to Petitioner's treatment. If there were such a concern, Counsel could seek an order sealing such information at the time of any such hearing.

Accordingly, the Court declines to vacate the Order dated April 24, 1987.

### CONCLUSION

For the reasons stated, the Court denies Petitioner's motion for conditional release and to vacate the stipulated Order dated April 24, 1987. An appropriate Order accompanies this Memorandum.

### *ORDER*

Upon consideration of the Petitioner, John W. Hinckley, Jr.'s, Motion for Conditional Release and to Vacate "Stipulated" Order Dated April 24, 1987, the opposition thereto, the evidence presented at the evidentiary hearing in this matter and the entire record

---

3. That Order provides:
It is hereby stipulated, subject to approval of the Court that should St. Elizabeths Hospital propose that defendant be released from the grounds of St. Elizabeths Hospital accompa-

nied by Hospital personnel, the Hospital shall provide two weeks written notice to this Court, to the United States Attorney for the District of Columbia and to counsel for defendant.
Order, April 24, 1987.

in this case, it is by the Court this 19th day of June 1997,

**ORDERED** that Petitioner's motion is **DENIED.**