John W. HINCKLEY, Jr., Appellant,

v.

UNITED STATES of America, Appellee.

No. 97–3094.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 16, 1998.

Decided April 14, 1998.

Barry Wm. Levine argued the cause for appellant, with whom John T. Kotelly, Adam Proujansky and Sarah M. Mortenson were on the briefs.

Helen M. Bollwerk, Assistant United States Attorney, argued the cause for appellee, with whom Wilma A. Lewis, United States Attorney, John R. Fisher, Thomas J. Tourish, Jr., Robert R. Chapman, and Thomas E. Zeno, Assistant United States Attorneys, were on the brief.

John M. Ferren, Corporation Counsel, Charles Reischel and Janet L. Maher, Deputy Corporation Counsel, and Maureen W. Zaniel, Assistant Corporation Counsel, were on the brief for amicus curiae District of Columbia.

Before: WALD, SILBERMAN and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Opinion concurring in the judgment filed by Circuit Judge HENDERSON.

WALD, Circuit Judge:

John W. Hinckley, Jr., an insanity acquittee presently committed to St. Elizabeths Hospital in Washington, D.C. ("Hospital"), filed a motion with the United States District Court seeking a conditional release under D.C.CODE ANN. § 24–301(k) (1981). This release would have permitted him to spend approximately one twelve-hour period per month in the community, with his parents but otherwise unsupervised. The Hospital did not support Hinckley's motion, and had already denied a similar request from him. The United States also opposed the motion. *See United States v. Hinckley,* 967 F.Supp. 557, 558–59 (D.D.C.1997). After a four-day evidentiary hearing, the district court, Judge June L. Green, found that Hinckley continues to present a danger to himself or others. It accordingly denied his motion for conditional release. *See id.* at 558.

In the present appeal, Hinckley argues that the district court's order should be vacated because, in a pre-hearing evidentiary ruling, the district court held that the deliberative process privilege shielded the discussion that took place between members of the Hospital's Review Board as they considered whether to support Hinckley's conditional release. Hinckley claims that this rul-

ing prevented him from testing the propriety of the Review Board's ultimate decision (made before the present case began) to deny Hinckley a conditional release. We reject this argument and affirm the district court's opinion.

## I. BACKGROUND

Hinckley attempted to assassinate then-President Ronald Reagan on March 30, 1981. In the process, he shot and wounded four people: Reagan, Presidential Press Secretary James Brady, Secret Service Agent Timothy McCarthy, and Metropolitan Police Officer Thomas Delahanty. At his criminal trial, Hinckley presented evidence that he was suffering from a mental disease and that his criminal actions were the result of that disease. On June 21, 1982, the jury found Hinckley not guilty by reason of insanity. The district court then committed Hinckley to St. Elizabeths Hospital, where he has remained to this day. *See id.*

During the course of his commitment, Hinckley has sought various forms of release from the U.S. District Court. All of these requests were either denied or withdrawn. In addition, in 1987 and 1988, the Hospital asked the district court to release Hinckley into the community under the supervision of Hospital staff, but subsequently withdrew those requests. *See id.*

The district court held a four-day hearing on Hinckley's present motion for conditional release. Hinckley presented five witnesses: two psychologists, two psychiatrists, and Hinckley's father. *See id.* Hinckley's four experts all testified that Hinckley suffers from a psychotic disorder and major depression, both of which are in remission, and from narcissistic personality disorder, which is active. They also testified that Hinckley would present 'a very low risk of danger to himself or others if the district court granted his request for conditional release. They further agreed that, if Hinckley had a recurrence of his prior active mental illnesses, any symptoms would develop slowly enough that they would be detectable before an unescorted visit. *See id.* at 559.

The United States presented one fact witness, Commander Jeanette Wick, and one expert psychiatrist, Dr. Raymond F. Patterson. *See id.* at 558. Wick, who is Chief Pharmacist at the Hospital, testified about her interactions with Hinckley. She stated that she first met Hinckley when she offered to lend him a book in late February or early March 1995. Wick testified that Hinckley then began making fairly frequent, and always unannounced, visits to her office. Over the course of these visits, Hinckley gave Wick audio tapes of music he had recorded, including one " 'love song' " that contained Wick's pet name for her daughter. Wick also discovered that Hinckley had been gathering information about her personal schedule with her daughter. *Id.* at 559.

This continued for about three weeks, until Wick's staff members told her that they believed she was spending too much time with Hinckley. Wick testified that she then informed Hinckley that he could not come to her office without calling first. Hinckley nonetheless continued to make unannounced visits, and Wick had to repeat her instruction. At that point, the Hospital pharmacy began to receive a high volume of hang up calls. When Wick answered the phone, Hinckley would identify himself as the caller. Wick testified that she reported these problems to Dr. Maureen Christian, Hinckley's therapist, and then began to avoid Hinckley completely. *See id.* at 559–60.

According to Wick's testimony, however, she had to file an incident report with the Hospital in September 1995 because Hinckley had disobeyed instructions by delivering a package to her. After the Hospital investigated, it imposed three restrictions on Hinckley: (1) Hinckley was prohibited from being in the general vicinity of the building in which Wick worked; (2) Hinckley could have no social relationship with Wick; and (3) whenever Hinckley planned to walk around the Hospital grounds, he had to tell a member of his treatment team what he was going to do and where he was going to be. *See id.* at 560.

Wick further testified that she now sees Hinckley on the third Monday of each month, when she attends a meeting in the Acute Care Hospital building. Wick stated that

Hinckley is frequently standing in the lobby when she arrives, and described one such encounter that took place in March 1996: " '[Hinckley] glares at me. He stares at me. I guess the kids would say, he stares me down.... I went to the elevator, and as I went to the elevator, [Hinckley] re-situated himself so he could keep me in his line of vision apparently.' " *Id.*

The district court credited Wick's testimony, and found that Hinckley had offered no evidence to rebut it. *See id.*

The government's expert witness, Dr. Patterson, also testified. Patterson agreed with Hinckley's experts that Hinckley's psychotic disorder and major depression are in remission. However, he did not agree that Hinckley would not be dangerous to himself or others if allowed to have unaccompanied visits in the community with his parents. *See id.* Here, Patterson cited a number of factors. Patterson explained:

> "The last time Mr. Hinckley was in the Community, unattended or unsupervised, the risk of dangerousness was extremely high. That was 16 years ago. Therefore, you have to consider *past history* and what factors went into his having committed that offense, and his subsequent improvement as observed by hospital staff and as reported by himself and by others, and the psychological testing that demonstrates some improvements in some areas and *some concerns that some very core personality issues remain unchanged.*"

*Id.* Patterson also based his opinion on Hinckley's "relationship" with Wick, stating that it bore some " 'striking similarities to the 'relationship' ... that he had with Ms. [Jodie] Foster' " and raised questions about whether Hinckley was obsessively infatuated with Wick. *Id.* at 560–61. The doctor stated that Hinckley's behavior toward Wick was significant because of Hinckley's history of stalking people, including President Carter, President Reagan, and Jodie Foster. Patterson described this past stalking as ultimately leading to Hinckley's assassination attempt on Reagan. *See id.* at 561.

But, in the district court's judgment, Patterson's description of Hinckley's past and continued propensity for deception and secretiveness, especially with respect to those responsible for treating him, was the most important factor that the doctor cited. Patterson observed that Hinckley's treatment team did not know about his "relationship" with Wick until nearly six months after the two had met. Patterson believed that this was consistent with Hinckley's history, including the failure of several mental health professionals who were treating Hinckley prior to his assassination attempt to detect Hinckley's psychosis and the failure of the Hospital on several occasions during Hinckley's commitment to detect behavior that represented continuing symptoms of his mental illness. *See id.* As Patterson elaborated:

> "There have been in the Mid-'80's, let's say in '83 to '88, a number of situations where Mr. Hinckley has not told people that are his treaters what he's actually thinking or doing. They relate to collecting pictures of Jodie Foster. They relate to requesting a nude caricature of Jodie Foster. Even up into the day before a hearing on the matter, Mr. Hinckley stat[ed] that it had no sexual content, was not nude.
>
> They relate to his writing Ted Bundy, his writings about Adolf Hitler, Charles Manson. And none of his treaters knew that from Mr. Hinckley telling them until he was confronted with it by third parties revealing that information to Hospital staff."

*Id.*

Based on this evidence, the district court made the following findings of fact: (1) "Petitioner's current diagnosis is psychotic disorder not otherwise specified, in remission; major depression, in remission; and, narcissistic personality disorder"; (2) "Petitioner has a history of deception and a record of screening information he is otherwise obligated to provide to treating and examining clinicians"; (3) "[a]s recently as March 1995–March 1996, Petitioner has engaged in conduct with the Chief Pharmacist at the Hospital, Jeanette Wick, that has disturbing parallels to the conduct leading up to the shooting of President Reagan including the stalking of President Carter and Jodie Foster"; and (4) "[t]he psychological testing results indicate

that Petitioner has made progress but continues to be 'very defensive and represses a lot of his feelings.'" *Id.* at 561–62. The court therefore concluded that Hinckley would present a danger to himself or others if granted a conditional release. *See id.* at 558.

## II. ANALYSIS

■ When Hinckley's motion for conditional release was before the district court, his arguments relating to the Hospital Review Board focused on the assertion that all evidence of the Review Board's decisionmaking and opinions should be inadmissible, because the Hospital had asserted that the Review Board's deliberations were privileged. With considerably less emphasis, Hinckley also contended that the deliberative process privilege did not apply to the Review Board's deliberations at all.[1] The district court disagreed on both counts. It found that the deliberative process privilege did protect the Review Board from having to disclose the substance of its deliberations. The district court also rejected Hinckley's argument that all Hospital Review Board evidence should accordingly be excluded, explaining:

> [T]he Review Board's decision should not be excluded simply because the privilege has been invoked. As discussed in *United States v. Ecker, infra,* the District Court has a responsibility to consider all relevant evidence. As the *Ecker* court stated, "[T]hese are truly investigatory proceedings in which traditional notions of proof are simply inapplicable. The district court, the hospital, the patient, and the government share an obligation to elucidate and explore all the relevant facts." *Id.* at 193. Accordingly, the Court will not exclude the Review Board decision from

the evidentiary hearing. In so ruling, the Court notes that all of the information and records available to the Review Board are also available to the parties here. If, in fact, the Government attempts to introduce the actual decision into evidence, the Court will give it such weight as it deserves.

J.A. at 164–65.

Ultimately, however, the district court's opinion mentioned the Hospital Review Board's decision to deny Hinckley a conditional release only twice. The second mention is clearly irrelevant to the present appeal. It concerned Hinckley's attempt to have the district court vacate an order requiring the Hospital to give two weeks of advance notice to the district court and the United States Attorney's Office before taking Hinckley on supervised excursions into the community. The district court denied this request on the ground, *inter alia,* that it was moot because "the Hospital has not extended 'B–City' privileges to the Petitioner," which would allow him to make supervised excursions into the community, "so the notice requirement is not even an issue at this stage." *Hinckley,* 967 F.Supp. at 563.

■ The first mention of the Hospital Review Board's decision appears in the district court opinion's discussion of the "standard of review." To be understood properly, this discussion must be read in full:

> As a motion for conditional release made pursuant to D.C.Code § 24–301(k), the Court is required to make findings of fact and conclusions of law with regard to whether the proposed release will benefit the patient and be safe for the public. *United States v. Ecker, II,* 543 F.2d 178, 191 (D.C.Cir.1976). In order for the Peti-

1. We reject the United States' argument that because Hinckley did not expressly raise the deliberative process challenge in the district court this court should apply a plain error standard in considering whether the privilege protects the Hospital Review Board's internal deliberations. Although Hinckley's motions before the district court certainly concentrated on the contention that all evidence relating to the Review Board should be inadmissible, Hinckley clearly, if briefly, stated the essence of his present claim. *See* Joint Appendix ("J.A.") at 157–58 ("Mr. Hinckley disputes the application of those privileges [the deliberative process privilege and the peer review privilege] in this context. Mr. Hinckley believes the deliberative process privilege applies only to policymaking, which was not at issue when the Review Board deliberated on Mr. Hinckley's request ...."); *id.* at 222 ("[T]he deliberative process privilege is what Congress does, it's what boards do when they are formulating policy. And of course that has nothing to do here either. So we believe the citation to those privileges and the invocation of those privileges is spurious. So we object on the grounds that there is no such privilege.").

tioner to be successful, the Court must, after weighing all of the evidence, find (by a preponderance of the evidence) that the Petitioner "will not, in the reasonable future, endanger himself or others." *Id.* at 187. The Court in *Ecker, II* noted that it is not "sufficient for the district court merely to find that the patient 'is no longer likely to injure himself or other persons because of mental illness.'" *Id.* The Court must make an "affirmative finding that it is at least more probable than not that [Petitioner] will not be violently dangerous in the future." *Id.*

In receiving and weighing the evidence, the Court is not bound to accept the opinion of any expert witness but is free to consider other evidence including "the patient's hospital file, the court files and records in the case, and whatever illumination is provided by counsel." *Id.* at 184–85.

In examining the evidence here, the Court notes that the request for conditional release has not come from the Hospital, but from the Petitioner and that the Hospital has, in fact, denied a similar request made by the Petitioner. Such a posture makes an exacting review of the evidence that much more important.

*Id.* at 559. The district court's opinion proceeded to offer a thorough description and analysis of the expert testimony and evidence that was before it. The district court never mentioned the Review Board's decision in this discussion.

Hinckley argues that this court should vacate the district court's order because the lower court improperly shielded the Review Board's deliberations under the deliberative process privilege. In our view, however, there are no grounds for vacating the district court's opinion, even if the court's ruling on the deliberative process privilege was mistaken—which we do not believe to be the case. The most plausible reading of the district court's opinion is that its review of the evidence did not rely on the Review Board's decision denying Hinckley a conditional release, much less on the Review Board's predecisional deliberations.

The most plausible reading of the recited passage is that it means exactly what it says.

The fact that the Hospital did not support Hinckley's conditional release did affect the district court's standard of review. Under the relevant District of Columbia statute, it meant that Hinckley bore the burden of proof by a preponderance of the evidence, *see* D.C.CODE ANN. § 24–301(k)(3) (1981), whereas he would not have borne that burden if the Hospital had supported his conditional release and gone to the district court on his behalf, *see id.* § 24–301(e). But after the district court established the burden of proof, there is no indication that the district court actually relied on the fact that the Hospital Review Board had denied Hinckley a conditional release when the court was independently evaluating the evidence in order to decide whether it should release Hinckley. Indeed, the district court's sole comment relating to that subject, which appears in the last two sentences of the passage quoted above, states only that the court undertook its *de novo* review extremely carefully in light of the Hospital's denial of a conditional release, a perfectly appropriate posture. Moreover, it is clearer still that the district court did not rely on the substance of the Review Board's internal *deliberations* in coming to its decision, precisely because the district court had no knowledge of the content of those deliberations.

■ This, however, is not our only ground for affirming the district court's opinion. We also find that, even if the district court did rely on the Hospital Review Board's denial of a conditional release when the court was conducting its review of the evidence, the district court properly held that the deliberative process privilege protects the internal deliberations of the Review Board. Here, it is important to stress the extraordinary nature of Hinckley's discovery request and the consequently limited scope of our holding. Hinckley had access to every piece of evidence that was before the Hospital Review Board and to a written statement explaining the Review Board's ultimate decision to deny him a conditional release. The only part of the Hospital's entire process that the district court protected under the deliberative process privilege was the discussion that took place between members of the Hospital Re-

view Board as they reviewed the evidence amongst themselves and came to their final decision. We break no new ground with regard to the scope of the deliberative process privilege in rejecting Hinckley's discovery request and affirming the district court's holding that the predecisional deliberations of the Hospital Review Board are protected under the deliberative process privilege.

A review of the steps that the Hospital followed in considering Hinckley's conditional release, and of the access that Hinckley had to this information, makes that clear. Hinckley's "treatment team" at the Hospital consists of a group of mental health professionals who are directly responsible for Hinckley's treatment and who make recommendations that they believe will advance his therapy. Hinckley had full access to the medical records that recount his treatment at the Hospital. In June 1996, Hinckley's treatment team recommended that the Hospital grant him a conditional release, which would allow him to spend one twelve-hour period per month in the community, with his parents but otherwise unsupervised. The treatment team also recommended that Hinckley receive "B–City" privileges, which would permit him to take excursions into the community under the supervision of Hospital staff. *See* J.A. at 87. The treatment team prepared a written report that made this recommendation and explained the psychological assessment behind it. Hinckley had access to this report, which appears in full in the joint appendix. *See id.* at 78–94.

Under Hospital procedure, the Hospital Review Board, which consists of every section head at the Hospital, has the ultimate responsibility for deciding on behalf of the Hospital whether to support a conditional release. The treatment team accordingly presented its written report to the Hospital Review Board. It also made an oral presentation to the Review Board and answered questions from Review Board members. The Hospital never asserted that any privilege covered this presentation, or the questions and answers that followed. In fact, Hinckley called Dr. John Kelley, a Hospital psychiatrist who was part of Hinckley's treatment team and who had made an oral presentation to the Review Board about Hinckley's conditional release, to testify before the district court. Kelley testified about who attended the meeting between the Review Board and the treatment team and what various people said, whether in making presentations, responding to questions, or asking questions.

After this meeting between the treatment team and the Review Board, the presenters and anyone who was directly responsible for Hinckley's therapy left the room. The Review Board deliberated on its own. The Hospital asserted a deliberative process privilege, and the district court recognized one, *only* with respect to these deliberations. *See* Brief of the District of Columbia as Amicus Curiae at 4 ("The District [of Columbia] is asserting that *only* the confidential discussion of the Review Board, that occurs after the treatment team finishes its presentation and after the Review Board examines the record and questions the team, is privileged."); Final Brief for Appellee at 36 ("[T]he only information withheld from [Hinckley] by the Hospital was the substance of the Review Board's deliberations as its members debated the appropriateness of the treatment team's recommendations.").[2] Once the Review Board came to a conclusion, it made a note in Hinckley's medical chart recording its decision and the reasons for its denial of a conditional release. Hinckley had access to this note, and it is included in the joint appendix. *See* J.A. at 215–16.

---

2. At oral argument, the United States again confirmed the very limited scope of the Hospital's assertion of privilege. The argument proceeded as follows:

Q. What kind of material, I'm just sort of asking.... What kind of material, generically, what kind of material didn't he [Hinckley] get?
A. The only thing that he did not have access to was the mental process of the Review Board members as they debated the appropriateness of the conditional release.
Q. But no documents, no no no documents were withheld by the Hospital [and] are not part of the record. But their discussion, back and forth, is [withheld].
A. That is correct, your Honor. That is our position.

■ We find that the deliberative process privilege protects the deliberations of the Review Board as it evaluated the evidence before it in order to come to a decision about Hinckley's conditional release.

■ This court has identified two prerequisites to the assertion of the deliberative process privilege: In deciding whether material is protected under this privilege, we consider whether the material is "predecisional" and whether it is "deliberative." *See, e.g., American Federation of Government Employees, Local 2782 v. U.S. Dep't of Commerce,* 907 F.2d 203, 207 (D.C.Cir.1990); *Formaldehyde Institute v. Dep't of Health and Human Services,* 889 F.2d 1118, 1121 (D.C.Cir.1989); *Senate of the Commonwealth of Puerto Rico v. U.S. Dep't of Justice,* 823 F.2d 574, 585 (D.C.Cir.1987); *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 866 (D.C.Cir.1980).

■ "A document [or information in another form] is 'predecisional' if it precedes, in temporal sequence, the 'decision' to which it relates. Accordingly, to approve exemption of a document as predecisional, a court must be able to pinpoint an agency decision or policy to which the document contributed." *Senate of the Commonwealth of Puerto Rico,* 823 F.2d at 585 (citation and internal quotation marks omitted); *see also Formaldehyde Institute,* 889 F.2d at 1122. In this case, it is undisputed that the information Hinckley seeks concerns the discussions that the Hospital Review Board had *prior* to its decision on Hinckley's conditional release. These discussions, moreover, were precisely designed to help the Review Board reach its final conclusion on Hinckley's conditional release. Accordingly, we find that the Review Board's deliberations are predecisional.

■ Communications are "deliberative" if they are "part of the agency give-and-take by which the decision itself is made. The agency must establish what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Senate of the Commonwealth of Puerto Rico,* 823 F.2d at 585–86 (citations, internal quotation marks, and alterations omitted). Hinckley does not dispute the fact that the information he seeks concerns the deliberations of the Hospital Review Board as it arrived at its decision about Hinckley's conditional release. However, he contends that the deliberations of the Hospital Review Board are nonetheless not "deliberative" within the meaning of the deliberative process privilege because the Review Board's decision about whether to grant Hinckley a conditional release allegedly constituted nothing more than "the routine application of already-formulated Hospital policy." Brief for John W. Hinckley, Jr. at 12. Hinckley is surely right in that the Hospital does not claim to have adopted new general policies to govern Hinckley's case; the Hospital claims only to have applied its standard decisionmaking procedures in reviewing the possibility of supporting Hinckley's conditional release. Nevertheless, we find Hinckley's argument unpersuasive.

First, this court has applied the deliberative process privilege to protect materials that concern individualized decisionmaking, rather than the development of generally applicable policy. *Mapother v. Dept. of Justice,* 3 F.3d 1533 (D.C.Cir.1993), for instance, involved the "Waldheim Report," which Justice Department experts had prepared in order to help the Attorney General decide whether to bar Kurt Waldheim from entering the United States because of evidence that he may have participated in Nazi war crimes. *See id.* at 1535. The Justice Department did not develop new policies of exclusion in the course of deciding Waldheim's case; rather, it applied the existing law governing the exclusion of Nazi war criminals. *See id.* Moreover, substantial portions of the Waldheim Report consisted simply of factual material culled from historical archives. *See id.* at 1538. Nonetheless, this court protected almost all of the report under the deliberative process privilege. *See id.* at 1537–40.

Second, the Review Board's decision about Hinckley's conditional release cannot be appropriately characterized as "routine." To be sure, the Review Board was determining in Hinckley's case, as in all such cases, the likelihood that the patient would pose a danger to himself or others if conditionally released into the community. But any such determination has to revolve around the

facts and circumstances in each instance. It necessarily involves the exercise of predictive judgment, based on case-specific discussion and debate. Moreover, it is easy to see how different Review Board members could disagree in their interpretation and analysis of the relevant information and in their final judgment. In sum, knowing the standards by which the Hospital judges the appropriateness of a conditional release tells us relatively little about whether any particular patient should actually be granted such a release. The Hospital Review Board's decision denying Hinckley a conditional release was not a "routine" one.

Moreover, the foundational policy concern underlying the deliberative process privilege supports the privilege's application in this case. "[T]he privilege rests most fundamentally on the belief that were agencies forced to operate in a fishbowl, ... the frank exchange of ideas and opinions would cease and the quality of administrative decisions would consequently suffer." *First Eastern Corp. v. Mainwaring*, 21 F.3d 465, 468 (D.C.Cir.1994) (citation and internal quotation marks omitted); *see also Mapother*, 3 F.3d at 1537 ("[T]he deliberative process privilege ... protects the decisionmaking processes of government agencies and encourages the frank discussion of legal and policy issues by ensuring that agencies are not forced to operate in a fishbowl.") (citation, internal quotation marks, and alterations omitted). The Hospital Review Board's deliberations as it considered whether to grant Hinckley a conditional release constitute precisely the sort of situation in which governmental decisionmakers need to know that their internal discussions will not be eventually exposed to public review. As this court has long recognized, insanity acquittees are an "exceptionally dangerous class." *United States v. Ecker*, 543 F.2d 178, 186 (D.C.Cir.1976). Deliberations about whether to allow them back into the community may accordingly attract substantial public interest and perhaps become the center of public controversy. Moreover, Review Board members might potentially be concerned for their personal safety in some instances, if the content of their internal deliberations were released to the insanity acquittee. The possibility of this sort of outside scrutiny of the Review Board's deliberations would almost certainly hamper the candor of future discussions, and perhaps even change the decisions that the Review Board reaches. In addition, Review Board members might be unwilling to criticize the proposals or assessments of other Hospital professionals not included in the deliberations, such as the members of the treatment team, if they knew that the Review Board's discussions could be made public.

■■■ As Hinckley notes, "[t]he deliberative process privilege is a qualified privilege and can be overcome by a sufficient showing of need." *In re Sealed Case*, 121 F.3d 729, 737 (D.C.Cir.1997). "For example, where there is reason to believe the documents sought may shed light on government misconduct, the privilege is routinely denied, on the grounds that shielding internal government deliberations in this context does not serve the public's interest in honest, effective government." *Id.* at 738 (citation and internal quotation marks omitted); *see also In re Subpoena Served Upon the Comptroller of the Currency*, 967 F.2d 630, 634 (D.C.Cir. 1992). Hinckley asserts that his attempt to access the deliberations of the Hospital Review Board falls within this exception to the deliberative process privilege, on the ground that he suspects that the Hospital Review Board had improper motivations when it denied him a conditional release. Hinckley contends that whatever showing he needs to make in this regard is satisfied by the mere fact that his treatment team unanimously recommended his conditional release.

We disagree on several grounds. First, this sort of argument appears to have no logical stopping point. The deliberative process privilege would soon be meaningless, if all someone seeking information otherwise protected under the privilege had to establish is that there was disagreement within the governmental entity at some point in the decisionmaking process. One of the key insights behind this privilege is that governmental decisionmakers will frequently disagree and debate many options before they reach any final conclusion, and that such

predecisional and deliberative discussions and disputes should be protected from public review. Second, the simple fact that Hinckley's treatment team and the Hospital's Review Board came to different conclusions does not suggest, in our view, any improper motivations on the part of the Review Board. As indicated above, Hinckley's treatment team and the Review Board have different functions and concerns. Whereas members of the treatment team are directly responsible for Hinckley's therapy and are charged with advocating the treatment program that they believe will best advance Hinckley's therapy, the Hospital Review Board is drawn from all sections of the Hospital and considers a wider array of issues, including most notably the danger that a conditional release would pose to the community.

 Hinckley also contends that the district court improperly invoked the deliberative process privilege because it failed to balance the government's interest in nondisclosure against Hinckley's need to obtain the Review Board's deliberations as evidence to support his motion for conditional release. As this court recently noted, adjudicating such an assertion of need requires a "balancing of the competing interests, taking into account factors such as the relevance of the evidence, the availability of other evidence, the seriousness of the litigation, the role of the government, and the possibility of future timidity by government employees." *In re Sealed Case,* 121 F.3d at 737–38 (citation and internal quotation marks omitted). In this case, the balance weighs strongly against granting Hinckley access to the Review Board's internal deliberations, notwithstanding the seriousness of the present litigation. First and most importantly, we see no reason to believe that these internal deliberations are particularly relevant to Hinckley's motion before the district court for conditional release. Hinckley has made no colorable showing that the Review Board acted improperly. Moreover, the district court conducted a *de novo* review of the evidence, rather than simply reviewing the Review Board's denial of Hinckley's request for conditional release. Second, the Hospital has already given Hinckley access to a tremendous amount of information, including all of the evidence that

was before the Review Board as well as the Review Board's final decision and explanation for it. Third, Hinckley has not even suggested that the United States has acted to thwart his motion before the district court in an improper or untoward manner. Fourth, granting Hinckley access to the Review Board's internal deliberations would seriously endanger the future candor of such discussions.

### III. CONCLUSION

The most plausible interpretation of the district court's opinion in this case is that its *de novo* review of the evidence did not rely on the Hospital Review Board's decision to refuse Hinckley a conditional release. Even if the district court did rely to some extent on the Review Board's decision, however, we find that the court properly protected the deliberations of the Review Board under the deliberative process privilege. The decision of the district court is accordingly

*Affirmed.*

KAREN LeCRAFT HENDERSON, Circuit Judge, concurring in the judgment:

I agree with the majority that "there is no indication that the district court actually relied on the fact that the Hospital Review Board had denied Hinckley a conditional release" and that "it is clearer still that the district court did not rely on the substance of the Review Board's internal *deliberations* in coming to its decision, precisely because the district court had no knowledge of the content of those deliberations." Maj. Op. at 283 (emphasis original). In *United States v. Ecker,* 543 F.2d 178 (D.C.Cir.1976), this Court emphasized the district court's expanded role in resolving a conditional release petition pursuant to D.C.Code § 24–301:

Thus, in conditional release proceedings (as well as unconditional release proceedings) the role of the district court (*i.e.,* the standard of review)

. . . is not simply to review the hospital's decision for unreasonableness, but rather itself to decide the ultimate question: whether the present status of the patient is such that continued confinement

[without conditional release] is justifiable.

... In order to approve a conditional release, we hold that *the district court must independently weigh the evidence and make a de novo determination* that the patient will not in the reasonable future endanger himself or others.

*Id.* at 186–87 (internal footnote and quotations omitted) (emphasis and brackets original). This is so because, as the *Ecker* court recognized, "when a district court is asked to review a conditional release certification the basic policy underlying section 301(e) comes into play, and the court must decide whether the hospital's proposal 'provide[s] treatment and cure for the individual in [sic] manner which affords reasonable assurance for the public safety.'" *Id.* at 182–83 (internal footnote omitted) (brackets original). The record reveals that the district court followed *Ecker* to the letter, "independently weigh[ing] and evaluat[ing] the evidence." *Id.* at 184. The district court relied heavily upon the opinion of the government's psychiatrist, Dr. Raymond F. Patterson, who described Hinckley's "past and continued propensity for deception and secretiveness, especially to those responsible for treating him." *United States v. Hinckley,* 967 F.Supp. 557, 560 (D.D.C.1997). And in evaluating the opinions of Hinckley's experts, the district court looked to Hinckley's own words:

Moreover, in considering the opinions of his experts, the Court is reminded of a journal entry made by Mr. Hinckley in 1987 in which he wrote:

I dare say that not one psychiatrist who has analyzed me knows any more about me than the average person on the street who has read about me in the newspapers. Psychiatry is a guessing game and I do my best to keep the fools guessing about me. They will never know the true John Hinckley. Only I fully understand myself.

Tr. 156–157; (stipulated to by counsel for Petitioner). What is particularly disturbing is that this statement was written at a time when the Petitioner had already undergone five years of treatment and had convinced his treatment clinicians that he had recovered sufficiently for conditional release. Statements such as these cause the Court to proceed carefully in weighing current assessments of the Petitioner by his experts.

*Id.* at 562. As the majority observes, the district court "never mentioned the Review Board's decision in this discussion." Maj. Op. at 282. The record plainly manifests that the district court did not rely on the Hospital Review Board's recommendation (indeed, the court did not deem it relevant except insofar as it caused the court to conduct an even more "exacting" review, 967 F.Supp. at 559). Accordingly, there is no need to reach the extraneous deliberative process privilege claim and I respectfully decline to join the majority's discussion of it.