UNITED STATES of America,

v.

John W. HINCKLEY, Jr.

No. CRIM.81–0306 PLF.

United States District Court, District of Columbia.

Dec. 17, 2003.

Robert Richard Chapman, Thomas Edwin Zeno, U.S. Attorney's Office, Washington, DC, for U.S.

Barry William Levine, Jodi Trulove, John Theodore Kotelly, Dicktein, Shapiro, Morin & Oshinsky, L.L.P., Tanya Robinson, Department of Mental Health, Washington, DC, for John W. Hinckley, Jr.

## OPINION

PAUL L. FRIEDMAN, District Judge.

On March 30, 1981, John W. Hinckley, Jr. attempted to assassinate the President of the United States, Ronald Reagan, in the driveway of the Washington Hilton Hotel. He wounded the President, Presidential Press Secretary James Brady, Secret Service Agent Timothy McCarthy, and Metropolitan Police Officer Thomas

Delahanty, and Mr. Brady suffered permanent brain damage. By a 13–count indictment filed on August 24, 1981, Mr. Hinckley was charged under federal law with attempted assassination of the President of the United States, assault on a federal officer, use of a firearm in the commission of a federal offense, and with attempted murder, multiple assault charges and a weapons charge under the District of Columbia Code.

After being found competent to stand trial, Mr. Hinckley filed a notice of intent to raise an insanity defense. At his criminal trial, Mr. Hinckley presented evidence that he suffered from a mental disease or defect that was responsible for his conduct on the day of the shootings, and, on June 21, 1982, a jury found him not guilty by reason of insanity on all counts of the indictment. Judge Barrington Parker thereupon committed Mr. Hinckley to St. Elizabeths Hospital under D.C.Code § 24–301, where he has remained to this day.[1]

The matter is now before the Court on John W. Hinckley, Jr.'s petition for limited conditional release pursuant to D.C.Code § 24–501(k) and on the proposal by St. Elizabeths Hospital that Mr. Hinckley be granted a limited conditional release pursuant to D.C.Code § 24–501(e). The government opposes both Mr. Hinckley's petition and the Hospital's proposal. An evidentiary hearing on the requested relief was held on November 17, 18 and 19, 2003, and continued on November 26, 2003. Closing arguments took place on December 4, 2003. Based on the evidence and arguments presented to the Court, and for the reasons that follow, the Court denies Mr. Hinckley's petition and grants the Hospital's proposal in part and denies it in part.

## I. BACKGROUND

D.C.Code § 24–501(k) provides that a person in the custody of a mental hospital after being acquitted by reason of insanity may seek his conditional or unconditional release from the custody of the hospital by filing an appropriate motion with the court. D.C.Code § 24–501(e) provides that the superintendent of the hospital on his own may at any time certify that the mental health of the person has sufficiently improved such that he will not "in the reasonable future be dangerous to himself or others" if conditionally released. D.C.Code § 24–501(e); *see Hough v. United States,* 271 F.2d 458, 461 (D.C.Cir.1959) (for conditional release "the court must conclude that the individual has recovered sufficiently so that under the proposed conditions [or others] 'such person will not in the reasonable future be dangerous to himself or others.'"). In either case, it is for the Court to determine whether the person warrants conditional release and, if so, under what conditions. *See* D.C.Code §§ 24–501(e), 501(k).

In the 21 years since John W. Hinckley, Jr. was committed to St. Elizabeths Hospital, both he and the Hospital have at various times sought some form of release from the Court. In both 1987 and 1988, the Hospital requested that Mr. Hinckley be released into the community under the supervision of Hospital staff, but both requests were withdrawn after the Hospital became aware that Mr. Hinckley had withheld information from the staff and had been deceptive. *See Hinckley v. United States,* 140 F.3d 277, 279 (D.C.Cir.1998); February 1999 Psychological Risk Assessment, Government's Exh. 7 ("Feb.1999 Risk Assess.") at 17–18.[2] In 1987, the

---

1. This opinion refers to both D.C.Code §§ 24–301(e) and 301(k) and D.C.Code §§ 24–501(e) and 501(k). Section 501 is the current incarnation of the former Section 301. The histor-

ical petitions for conditional release were filed under Section 301.

2. All exhibits, designated herein as "Exh.," refer to exhibits offered either by the govern-

Hospital request was withdrawn when it surfaced that Mr. Hinckley had written to Ted Bundy and had 57 pictures of Jodie Foster hidden in his room. The night before the 1988 hearing, Mr. Hinckley revealed that he had requested a nude caricature of Jodie Foster, a fact of which the Secret Service was already aware, and the request again was withdrawn. *See* Feb. 1999 Risk Assess. at 17–18.

In 1996, Mr. Hinckley petitioned the Court for conditional release under D.C.Code 24–301(k) to allow him 12-hour per month unsupervised visits with his parents off Hospital grounds. *See United States v. Hinckley*, 967 F.Supp. 557, 560–61 (D.D.C.1997). The government called Dr. Raymond F. Patterson as an expert witness to testify at the evidentiary hearing with respect to this petition. Dr. Patterson opposed Mr. Hinckley's petition and disagreed with the Hospital's view that Mr. Hinckley would not be dangerous to himself or others if allowed unaccompanied visits with his parents. *See id.* at 560. Dr. Patterson referenced Mr. Hinckley's conduct with respect to the then-Chief Pharmacist at the Hospital, Commander Jeanette Wick, which was described by Dr. Patterson as bearing "striking similarities" to the pattern of behavior evidenced by Mr. Hinckley towards Jodie Foster prior to the attempted assassination of President Reagan.[3] Dr. Patterson viewed this "stalking" behavior as similar to Mr. Hinckley's prior history of stalking President Carter, President Reagan and Jodie Foster, and his obsessive infatuation with Ms. Foster. *Id.* at 561. This conduct, along with Mr. Hinckley's "past and continued propensity for deception and secretiveness, especially to those responsible for

treating him," led Judge June Green to deny Mr. Hinckley's petition. *Id.*

Later in 1997, the Hospital notified the Court that it was approving a six-hour outing off Hospital grounds for Mr. Hinckley to visit his parents and his then-girlfriend, Leslie DeVeau, in the company of Hospital staff. The government objected, and after an evidentiary hearing, Judge Green ruled that Mr. Hinckley would not be permitted to leave the Hospital grounds because of Mr. Hinckley's "criminal conduct and his conduct at the Hospital since his admission in 1982." *United States v. Hinckley*, 984 F.Supp. 35, 37 (D.D.C.1997). On appeal, however, the court of appeals concluded that the proposed outing was not a "conditional release" within the meaning of D.C.Code § 24–301(e) because Mr. Hinckley would be in the custody of Hospital personnel; the district court therefore did not have jurisdiction to either approve or reject the Hospital's proposal. *See Hinckley v. United States*, 163 F.3d 647, 652–55 (D.C.Cir.1999).

The Hospital granted Mr. Hinckley "B" city privileges in 1999 which allowed him to participate in trips away from the Hospital grounds under the supervision of Hospital staff. *See* Transcript of November 2003 Evidentiary Hearing ("Tr."), Vol. I at 38 (Dr. Binks). On March 10, 2000, the Secret Service informed the Hospital that Mr. Hinckley had approached and examined several books at bookstores while on "B" city excursions that the Secret Service believed could be relevant to Mr. Hinckley's clinical assessment and treatment. *See* March 10, 2000 Letter from Secret Service, Defendant's Exh. 4 ("Secret Service Letter"). Mr. Hinckley's treatment team reviewed the correspon-

---

ment or by counsel for Mr. Hinckley and admitted in evidence by the Court at the November 2003 evidentiary hearing.

3. Mr. Hinckley had reported that he had tried to kill President Reagan in order to impress Jodie Foster.

dence and interviewed Mr. Hinckley, but concluded that Mr. Hinckley's interest in the materials was "significantly different" from his fascination with the violently-themed materials he had been reading at the time of the assassination attempt. March 14, 2000 Progress Note, Defendant's Exh. 5.

Because of the success of the "B" city visits, and despite the questions raised by the Secret Service, on March 31, 2000, the Hospital submitted a Section 301(e) proposal recommending that the Court allow Mr. Hinckley a limited conditional release by which he would be permitted unsupervised day visits with his parents in the Washington, D.C. area. *See* March 31, 2000 Letter from D.C. Commission on Mental Health Services, Government's Exh. 14 ("March 31, 2000 Letter"). Prior to the hearing on the Hospital's proposal, the government subpoenaed the bank statements and credit card records of Ms. DeVeau. *See* July 10, 2000 Report of Dr. Teresa Stathas, Government's Exh. 12 ("Stathas Rep.") at 1. After becoming aware of the subpoenas, Mr. Hinckley reported that there were several books he had read that might be significant. He produced a list of the titles and was placed on ward hold as the titles were reviewed. *See id.* Ms. DeVeau then informed Dr. Stathas that she had purchased a book on Jodie Foster in 1998, and the treatment team discovered that Mr. Hinckley recently had learned about Ms. DeVeau's purchase of the book but had not disclosed his knowledge of the book to anyone on the treatment team. *See id.* at 1, 3.[4] The Hospital was concerned about Mr. Hinckley's deceptive tendencies and his relationship with his treatment team since he re-

vealed his list of reading materials only after learning of the subpoenas. *See id.* at 9. The Hospital therefore withdrew the conditional release proposal it had made to the Court, but determined that Mr. Hinckley should not lose any of his then-current privileges as a result of the incident. *See id.* at 10.

Mr. Hinckley currently enjoys "D" privileges, which allow him unsupervised access to the Hospital grounds and "B" city privileges which involve trips into the community supervised by Hospital staff. *See* Tr., Vol. I at 28, 35 (Dr. Binks). He has participated in over 200 "B" city outings without incident. *See* Tr., Vol. IIa at 45 (Dr. Keisling). These have included trips with other patients to bowling alleys, malls, the theater, restaurants, the beach and bookstores, as well as excursions with his parents, which have included meals at restaurants and visits to Leslie DeVeau's house. *See* Tr., Vol. I at 40–41 (Dr. Binks). Mr. Hinckley is not currently permitted to leave the Hospital without the supervision of Hospital personnel.

Mr. Hinckley is petitioning the Court under D.C.Code § 24–501(k) to release him into the community under the supervision of his parents for five 12–hour day visits at their home, outside the Washington, D.C. area, unsupervised by Hospital personnel, followed by five 36–hour overnight visits at his parents' home, also unsupervised by Hospital personnel. *See* Motion for Limited Conditional Release at 1.

The Hospital opposes Mr. Hinckley's petition and has submitted a more gradual release proposal under D.C.Code § 24–501(e). The Hospital proposes that Mr. Hinckley be allowed two 12–hour visits

---

**4.** When questioned, Mr. Hinckley indicated that he had only recently learned about the book purchased by Ms. DeVeau and that he had told Dr. Keisling, who was no longer Mr. Hinckley's psychiatrist at the time but had

been retained by Mr Hinckley's counsel in preparation for the 2000 hearing. Dr. Keisling could not recall whether or not Mr. Hinckley had told him about the book. *See* Stathas Rep. at 3.

with his parents in the Washington, D.C. area on either Saturdays or Sundays, followed by two 32–hour overnight visits with his parents in a hotel in the Washington, D.C. area, also on weekends. If those visits are successful, then the Hospital proposes six overnight, 36–hour visits on weekends at his parents' home outside the Washington, D.C. area. *See* August 5, 2003 Letter from D.C. Department of Mental Health, Defendant's Exh. 7 ("Aug. 5 Letter"); November 25, 2003 Letter from D.C. Department of Mental Health, Defendant's Exh. 11 ("Nov. 25 Letter").[5]

The government opposes both Mr. Hinckley's petition and the Hospital's proposal.

## II. LEGAL FRAMEWORK

A person who has been confined to a hospital for the mentally ill after having been acquitted of a crime by reason of insanity has two means of achieving conditional release. He may file a petition with the court seeking his conditional release. *See* D.C.Code § 24–501(k). Alternatively, if the superintendent of the hospital where the person is confined believes that the patient is in a condition to be conditionally released under supervision, the superintendent may file a certificate with the clerk of the court so indicating. *See* D.C.Code § 24–501(e). The letters of August 5, 2003, and November 25, 2003, from the Hospital express the belief that Mr. Hinckley has recovered sufficiently from his mental illness to be granted a limited conditional release under Section 501(e). *See* Aug. 5, 2003 Letter; Nov. 25, 2003 Letter. Whether the court is considering a patient's petition or the superintendent's certificate, unless the request is uncontested or the outcome plain, the court must hold a hearing to determine the present mental condition of the person and whether, if released, he will be a danger to himself or others in the reasonable future. D.C.Code §§ 24–501(e), (k).

When the matter comes before the court on a petition under D.C.Code § 24–501(k), "the person [seeking release] shall have the burden of proof," and the court must find "by a preponderance of the evidence" that the person is entitled to conditional release. D.C.Code § 24–501(k). By contrast, the statute does not make clear who carries the burden of proof in a hospital-initiated release proposal. *See* D.C.Code § 501(e). Judge Wilkey's opinion in *United States v. Ecker* indicates that in a hospital-initiated proceeding, there is "no assignable burden of proof;" rather, these are "truly investigatory proceedings," and the court, the hospital, the patient and the government all "share an obligation to elucidate and explore all the relevant facts." *United States v. Ecker*, 543 F.2d 178, 193 (D.C.Cir.1976). Judge Lumbard, concurring, would have placed the burden of proof on the hospital to demonstrate by a preponderance of the evidence that condi-

5. This release proposal was first recommended by Mr. Hinckley's treatment team. The treatment team consists of Mr. Hinckley's treating psychiatrist, Dr. Thomas Green, his treating psychologist, Dr. Sidney Binks, a social worker, a forensic psychiatric technician, and a clinical administrator. Sometimes other nursing staff and work supervisors are present during treatment planning sessions. *See* Tr., Vol. I at 62 (Dr. Binks). The treatment team recommended Mr. Hinckley's release to the Hospital Review Board. The Review Board consists of senior mental health professionals within the John Howard Pavilion at St. Elizabeths Hospital, including the Acting Associate Director for Forensic Services, the Pretrial Chief, the Post-trial Chief, and representatives of other disciplines including Nursing, Substance Abuse, Social Work, Psychology and Rehabilitation Services. *See* Tr., Vol. IV at 63 (Dr. Montalbano). The Review Board approved the treatment team's proposal and ultimately sent a letter to the Court on August 5, 2003 recommending Mr. Hinckley for conditional release. *See* Tr., Vol. I at 62 (Dr. Binks).

tional release would not endanger others. *Id.* at 201 (Lumbard, J., concurring). Judge Wright, in his dissent, noted that it would be strange to place the burden of proof on the hospital where the government (perhaps technically representing the hospital) may itself be opposing the motion, that Judge Wilkey's opinion "seems clearly to place the burden of *persuasion* on the patient or perhaps the hospital," and that hospital certification "must mean that the hurdles are not as high as if [the patient] sought conditional release on his own motion." *Id.* at 202–03 n. 5 (Wright, J., dissenting) (emphasis in original). The court of appeals later noted, with respect to a Section 301(k) petition filed by Mr. Hinckley seeking conditional release that was denied by the district court, that Mr. Hinckley would not bear the burden of proving his case by a preponderance of the evidence "if the Hospital had supported his conditional release and gone to the district court on his behalf." *Hinckley v. U.S.*, 140 F.3d at 282.

Regardless of who bears the burden of proof or persuasion, it is clear to this Court that the Hospital's proposal under D.C.Code § 24–501(e) should only be approved if the evidence shows that the proposed conditional release is appropriate under the standards set forth in the statute by a preponderance of the evidence. *See United States v. Ecker*, 543 F.2d at 188 (district court must make an "affirmative finding that it is at least more probable than not" that the patient will not be violently dangerous in the future); *De-Veau v. United States*, 483 A.2d 307, 310 (D.C.1984) (preponderance standard endorsed).

 In considering either a hospital-initiated or a patient-initiated request for conditional release, the district court is obligated to make its own independent judicial determination regarding the patient's dangerousness. *See United States v. Ecker*, 543 F.2d at 184. The function of the court is to determine whether the facts as shown by the evidence offered "measure up to the statutory standards for release." *Id.* at 185. In order to grant release, the court must determine that the patient, under the proposed conditions, "will not in the reasonable future be dangerous to himself or others." *Hough v. United States*, 271 F.2d at 461; *see also United States v. Ecker*, 543 F.2d at 187. Under this standard, the existence of "a substantial problem of danger in the reasonable future provides an adequate basis for the continued detention and confinement of an insanity acquittee" who has committed a violent act. *United States v. Ecker*, 543 F.2d at 188. If, on the other hand, the evidence shows by a preponderance of evidence that the patient will not be a danger under the proposed or other reasonable conditions of release, then the court must grant the petition for conditional release.[6]

 As the government points out, in receiving and considering the evidence, a court is not required to accept the opinion of any expert witness, or even the unanimous opinion of all the experts, but must consider all relevant evidence including "the patient's hospital file, the court files and records in the case, and whatever illumination is provided by counsel." *United States v. Ecker*, 543 F.2d at 184–85; *see also id.* at 190 ("the issue of 'dangerousness' presents the district court with a difficult mixed question of law and fact, and the court is under no obligation to accept the experts' opinions on questions of law"). The court must independently

---

**6.** The court may modify or expand upon the conditions proposed by the Hospital. *See* D.C.Code § 24–501(e) (conditional release "under such conditions as the court shall see fit").

weigh the evidence and decide for itself the ultimate question whether if released under appropriate conditions the patient will not in the reasonable future be dangerous to himself or others. *See id.* at 187. The court must take care, however, to base any denial of release on the evidence itself, and not substitute its own opinion for the evidence presented by the parties. *See id.* at 185 n. 20.

The government argues that Mr. Hinckley has failed to carry his burden under Section 501(k) of the statute and that the Hospital's proposal fails to satisfy the requirements of Section 501(e). The government believes that Mr. Hinckley still poses a substantial risk of danger and that he cannot safely be released from the Hospital for limited periods of time under the supervision of his parents even under the conditions proposed by the Hospital.

The government argues that release should be denied on the following grounds: (1) Mr. Hinckley has a long history of violence, and the damage he caused to President Reagan, Mr. Brady and his other victims on March 30, 1981 was enormous; (2) Mr. Hinckley's narcissism is not in remission and his psychosis could return without being noticed promptly, as evidenced by his stalking of Commander Wick in 1995; (3) Mr. Hinckley's long history of deception goes back to the early 1980's and is reflected in his lies about his lack of interest in Jodie Foster to Dr. Miller in 1987 and to Dr. Patterson in 1988, his withholding of information with respect to Commander Wick in 1995, his failure to disclose Ms. DeVeau's purchase of the Jodie Foster book in 2000, and his failure to fully identify the books he was reading prior to 2000; (4) Mr. Hinckley is intentionally attempting to keep mental health professionals in the dark about what he is thinking by ceasing his prolific reading and writing activities, thus making the data available too limited to properly evaluate him; (5) Mr. Hinckley's psychological tests are elevated for controlled hostility and indicate that he is defensive and guarded; (6) mental health professionals at the Hospital, having become advocates for Mr. Hinckley, have failed to grasp the impact of his ongoing narcissism, have downplayed his deceptiveness, and have failed to recognize the serious concerns raised by the books he has read and examined; and (7) Mr. Hinckley's parents are not adequate custodians because they are elderly and could not physically control him if doing so became necessary, they do not believe he is currently mentally ill or dangerous and thus lack insight into his problems, and they will not know what to do if problems develop while he is away from the Hospital under their supervision.

In examining the evidence, the Court notes that Mr. Hinckley's petition under Section 501(k) is opposed not only by the government, but also by the Hospital and the majority of the testifying experts. The Court also notes that major portions of the Hospital's proposal for conditional release under Section 501(e), as amplified by its letter of November 25, 2003, are supported by all of the experts called to testify both by Mr. Hinckley and by the government. None of the experts believes that Mr. Hinckley would pose a danger to himself or others if released on appropriate conditions to the supervision of his parents.

## III. EVIDENTIARY HEARING

At the evidentiary hearing, counsel for Mr. Hinckley called as witnesses: (1) Dr. Sidney W. Binks, a PhD psychologist specializing in neuropsychiatric disorders, who has been a member of Mr. Hinckley's treatment team and his treating psychologist since 1999; (2) Dr. Robert Keisling, a psychiatrist and former Medical Director of the Forensic Inpatient Service at John

Howard Pavilion at St. Elizabeths Hospital, who was Mr. Hinckley's treating psychiatrist from mid–1998 until September 1999; and (3) Mrs. Jo Ann Hinckley, Mr. Hinckley's mother. The government called as witnesses: (1) Dr. Robert Phillips, a psychiatrist and former Director of Forensic Services for the State of Connecticut Department of Mental Health, who examined Mr. Hinckley at the request of the government in both 2000 and 2003; and (2) Dr. Raymond F. Patterson, a psychiatrist, former Medical Director and former Acting Associate Superintendent at St. Elizabeths Hospital, former Commissioner of Mental Health in the District of Columbia, and former Forensics Director for the State of Maryland, who examined Mr. Hinckley in 1996 and 1997 and testified in opposition to his conditional release at the 1997 hearing before Judge Green. *See* Tr., Vol. IIb at 27, 33 (Dr. Phillips); Tr., Vol. III at 39–40 (Dr. Patterson). When the hearing reconvened, counsel for Mr. Hinckley called as a rebuttal witness Dr. Paul Montalbano, Pretrial Chief at the Forensic Services Unit at John Howard Pavilion at St. Elizabeths Hospital, who conducted psychological risk analyses of Mr. Hinckley in 1999 and 2003. *See* Tr., Vol IV at 5, 11 (Dr. Montalbano).

*A. Expert Testimony and Reports*

The expert witnesses for both Mr. Hinckley and the government were in substantial agreement concerning Mr. Hinckley's current diagnosis. All agree that he currently is mentally ill and suffers from psychotic disorder, not otherwise specified ("psychotic disorder NOS"); major depression; and narcissistic personality disorder.

Both the psychotic disorder NOS and the major depression disorder, his Axis I disorders, were described by all the experts as being in full remission. Although the experts disagree as to the exact number of years that Mr. Hinckley's Axis I disorders have been in full remission, they all concur that he has been asymptomatic for a significant period of time. *See* Tr., Vol. I at 21–22 (Dr. Binks); Tr. Vol. IIa at 18 (Dr. Keisling); Tr., Vol. IIb at 34 (Dr. Phillips); Tr., Vol. III at 43 (Dr. Patterson).[7] As to Mr. Hinckley's Axis II disorder, narcissistic personality disorder, Dr. Keisling opined that Mr. Hinckley is no longer displaying overt signs of narcissism, which could include a grandiose sense of self-importance; the patient's belief that he is special and unique; a sense of entitlement; interpersonal exploitation; a lack of empathy; and arrogance. *See* Tr., Vol. IIa at 28–29 (Dr. Keisling).

The doctors noted that Mr. Hinckley currently is self-medicated on 1mg of Risperdal per day. *See* Tr., Vol. I at 59 (Dr. Binks). The Risperdal is purely prophylactic and is intended to prevent a relapse of his psychotic disorder. If Mr. Hinckley were to miss the medication, there would be no immediate physiological change, and he would probably have to miss several weeks before the lack of medication would be physiologically significant. *See* Tr., Vol. IIa at 26–27, 39 (Dr. Keisling).[8]

Since the withdrawn conditional release proposal of 2000, Mr. Hinckley has not violated any of his privileges. He has never tried to elope (that is, escape) and he has not been violent or aggressive at

---

7. Remission means that Mr. Hinckley has no symptoms at present, but it is always possible that the symptoms could return. *See* Tr., Vol. IIa at 34–35 (Dr. Keisling). "Full remission," according to Dr. Binks, means that there has been no evidence of the disorder or no active symptoms for a "significant period" of time. In Mr. Hinckley's case, this means there has

been no evidence of his Axis I disorders for more than a decade. *See* Tr., Vol. I at 22 (Dr. Binks).

8. It would, however, be clinically significant were Mr. Hinckley to elect to stop self-medicating. *See* Tr., Vol. I at 61 (Dr. Binks).

the Hospital or on the "B" city trips. All the experts agreed that Mr. Hinckley would present a very low risk of danger to himself or others should the Hospital's request for conditional release for local, unsupervised day visits with his parents be granted, and all except Dr. Phillips have the same positive view of overnight trips with his parents in a hotel in the Washington, D.C. area. *See* Tr., Vol. III at 28 (Dr. Phillips).[9] The majority of the experts and the Hospital believe that Mr. Hinckley's proposal under Section 501(k) is not appropriate at this time. *See* Report of Dr. Robert Phillips, Government's Exh. 2 ("Phillips Rep.") at 52; Report of Dr. Raymond Patterson, Government's Exh. 4 ("Patterson Rep.") at 23; Aug. 5, 2003 Letter.[10]

All the experts who testified had access to four psychological risk assessments of Mr. Hinckley conducted by Dr. Paul Montalbano in 1999 and 2003 based on a battery of psychological tests administered by Dr. Montalbano. The most recent tests indicated that Mr. Hinckley has a consistently elevated "K" scale, which is indicative of defensiveness or guardedness. *See* August 4, 2003 Psychological Testing Update, Government's Exh. 10 ("Aug.2003 Risk Assess.") at 6. Dr. Montalbano expressed the concern that Mr. Hinckley "overcontrolled hostility" and, as a result, may rigidly deny hostility or anger. *Id.* at 7. Dr. Montalbano expressed the view, with respect to the incident in 2000 when Ms. DeVeau told Mr. Hinckley that she had purchased a book about Jodie Foster and Mr. Hinckley did not inform his treatment team, that Mr. Hinckley exercised "poor

judgment" and "deliberately withheld important information from the treatment team." January 22, 2003 Psychological Risk Assessment Update, Government's Exh. 9 ("Jan.2003 Risk Assess.") at 17. When Dr. Montalbano interviewed Mr. Hinckley on this topic, Mr. Hinckley was "vague" and "evasive." *Id.* Dr. Montalbano's most recent risk assessment update in August 2003 indicates that because Mr. Hinckley is "markedly defensive" and tends to minimize problems and present himself in "an overly positive and socially virtuous manner," the information based on his self-reporting may underrepresent problems or pathology. Aug. 2003 Risk Assess. at 6.

Despite certain negative characteristics indicated by the testing, and the fact that Mr. Hinckley tends to function better in structured settings, Dr. Montalbano determined that a "specific, time-limited conditional release under the supervision of [Mr. Hinckley's] parents" was clinically appropriate. Aug.2003 Risk Assess. at 12. Dr. Montalbano indicated that there was a "low" risk of dangerousness to either Mr. Hinckley or others in the context of such a controlled release. *See id.* at 12; January 2003 Risk Assess. at 20.

### 1. Petitioner's Expert Witnesses

Dr. Sidney Binks, Mr. Hinckley's treating psychologist at the Hospital since 1999, and Dr. Robert Keisling, Mr. Hinckley's treating psychiatrist in 1998 and 1999, who was retained as a consultant by Mr. Hinckley's lawyers in this case, both testified that Mr. Hinckley would not be dangerous to himself or others under the conditions

---

9. Dr. Phillips did not oppose the local overnight trips but stressed that the Hospital should "thoroughly assess the success of the time-limited conditional release day passes under specialized conditions before entertaining overnight visits." Report of Dr. Robert Phillips, Government's Exh. 2. at 53.

10. Dr. Robert Keisling testified that he is "very confident" that Mr. Hinckley would not pose a danger under either the Hospital's Section 501(e) proposal or under Mr. Hinckley's Section 501(k) proposal. Tr., Vol. IIa 17 (Dr. Keisling).

proposed by the Hospital for conditional release. Both doctors also expressed the view that Mr. Hinckley will comply with whatever conditions of release are imposed. *See* Tr., Vol. I at 62 (Dr. Binks); Tr., Vol. IIa at 69 (Dr. Keisling). Dr. Binks suggested that the Hospital's proposal was "cautious" compared to those it has proposed for other patients, Tr., Vol. I at 21 (Dr. Binks), and Dr. Keisling stated that he is aware of no behavior on the part of Mr. Hinckley that would weigh against his release. *See* Tr., Vol. IIa at 18 (Dr. Keisling).

Dr. Keisling testified that Mr. Hinckley has been violent only during psychotic episodes and that there has been no evidence of psychosis for 16 years, since 1987. *See* Tr., Vol. IIa at 20 (Dr. Keisling). He said that symptoms of psychosis in Mr. Hinckley's past have included delusional thoughts and grandiose delusions. *See* Tr., Vol IIa at 19 (Dr. Keisling). Dr. Binks indicated that dangerousness is linked directly to psychosis, that it was the Axis I disorders that led to Mr. Hinckley's violent acts in the 1980s, and that Mr. Hinckley's psychotic disorder also was the primary motivator for his deception. Dr. Binks agreed with Dr. Keisling that there have been no signs of delusion or depression for over ten years and testified that there is no current evidence of deception. *See* Tr., Vol. I at 22, 100 (Dr. Binks). Both doctors agree that it would be extremely difficult to conceal the symptoms of psychosis over long periods of time. *See* Tr., Vol. I at 27 (Dr. Binks); Tr., Vol. IIa at 20 (Dr. Keisling).

Dr. Keisling explained that, generally, when a patient suffers from strong delusional beliefs, there is some observable manifestation of those delusions. He finds it extremely implausible that Mr. Hinckley continues to harbor grandiose delusions and has managed to conceal this fact from his doctors. *See* Tr., Vol. IIa at 62–63 (Dr. Keisling). Dr. Keisling also testifed that symptoms of major depression—which would include isolation, withdrawal, loss of interest in normal activity, hopelessness and suicidal thoughts—also are in full remission and likewise are hard to disguise. *See* Tr., Vol. IIa at 21–22 (Dr. Keisling). Although Mr. Hinckley's narcissistic personality disorder is not in remission, Dr. Binks and Dr. Keisling both testified that there is no reason to believe that the narcissistic personality disorder alone makes Mr. Hinckley dangerous. Rather, they reiterated, it was the Axis I disorders that caused his violent behavior and suicide attempts in the 1980s. *See* Tr., Vol. I at 22 (Dr. Binks); Tr., Vol. IIa at 30 (Dr. Keisling).

Dr. Binks and Dr. Keisling indicated that Mr. Hinckley's behavior since the time of the 2000 petition supports their judgment that he is ready for limited conditional release. *See* Tr., Vol. I at 28 (Dr. Binks); Tr., Vol. IIa at 41 (Dr. Keisling). Dr. Binks testified that Mr. Hinckley has exercised all of his privileges responsibly. He has not tried to elope from the Hospital grounds or while exercising "B" city privileges. *See* Tr., Vol. I at 28 (Dr. Binks); *see also* Tr., Vol. IIa at 41 (Dr. Keisling). There have been "scores and scores" of successful "B" city visits. Tr., Vol. I at 39 (Dr. Binks). Dr. Binks considers the visits to be "very therapeutic" and testified that the more of them in which Mr. Hinckley participates, the "happier and better he feels." Tr., Vol. I at 42 (Dr. Binks). Both doctors testified that Mr. Hinckley does not fight with other patients and is not argumentative. *See* Tr., Vol. I at 29 (Dr. Binks); Tr., Vol. IIa at 42 (Dr. Keisling). Mr. Hinckley has worked at the Hospital library five days a week for more than a year, and his job evaluations have been "very excellent"; his supervisor has expressed the view that she would recom-

mend him for jobs outside the Hospital. Tr., Vol. I at 30–31 (Dr. Binks).

Both Dr. Binks and Dr. Keisling testified about the end of Mr. Hinckley's 16–year romantic relationship with Leslie DeVeau. *See* Tr., Vol. I at 25 (Dr. Binks); Tr., Vol. IIa at 35. (Dr. Keisling). Mr. Hinckley represented to the doctors that Ms. DeVeau began to withdraw from the relationship, and that she and Mr. Hinckley now are just friends. *See* Tr., Vol. I at 26 (Dr. Binks). According to Dr. Binks, Ms. DeVeau visits Mr. Hinckley weekly to bring food for the cats that Mr. Hinckley has been taking care of for five years on the Hospital grounds, and Mr. Hinckley and Ms. DeVeau still talk daily by telephone. *See* Tr., Vol. I at 26 (Dr. Binks). Both experts agreed that because the end of Mr. Hinckley's relationship with Ms. DeVeau was accompanied by appropriate sadness and because the incident did not result in a recurrence of his depression, the experience could be viewed as partially instructive as to how he might handle stressful situations outside of the Hospital in the future. *See* Tr. Vol. I at 25–26 (Dr. Binks); Tr., Vol. IIa at 36 (Dr. Keisling). Dr. Keisling believes that Mr. Hinckley now is able to handle stress and control his impulses. *See* Tr., Vol. IIa at 36 (Dr. Keisling). Dr. Binks indicated that Mr. Hinckley is becoming more emotionally expressive; he has expressed remorse about his crime and is developing a sense of empathy. *See* Tr., Vol. I at 24–25, 33 (Dr. Binks).

With respect to Dr. Montalbano's risk assessment, Dr. Binks clarified that a score of "low," such as Mr. Hinckley received, was the bottom of the scale and that no patient's test results ever indicated "no risk" of danger. He pointed out that

Mr. Hinckley had actually declined from the low end of the moderate scale to simply low between Dr. Montalbano's testing in 1999 and his testing in 2003. Dr. Binks also pointed out that Dr. Montalbano's report found that there would be a low risk of dangerousness over a period of seven to ten years even if Mr. Hinckley were unsupervised and that the risk for short, unsupervised visits such as those proposed by the Hospital would be far lower. *See* Tr., Vol. I at 46–50 (Dr. Binks). Both Dr. Binks and Dr. Keisling noted that the testing revealed no evidence of delusion or depression and that Mr. Hinckley's ability to control his impulses is about the same as any other person's. *See* Tr., Vol. I at 48–49 (Dr. Binks); Tr., Vol. IIa at 76 (Dr. Keisling).

Both doctors were asked about the behavior which had led to the denial of the 1997 petition and the withdrawal of the 2000 petition. With respect to the incident involving Commander Wick, Dr. Binks believes that Mr. Hinckley had become infatuated with her, but that the infatuation was normal, and the incident should not have a negative impact on Mr. Hinckley's current petition for conditional release. Dr. Binks does not believe that the Wick incident was clinically significant and does not believe that it suggests dangerousness regardless of whether one accepted Mr. Hinckley's version of events or Commander Wick's. *See* Tr., Vol. I at 90 (Dr. Binks).[11] Dr. Keisling stated that he did not believe the Wick incident provided reason to believe that Mr. Hinckley posed a danger to himself or others. *See* Tr., Vol. IIa at 69 (Dr. Keisling).

Both Dr. Binks and Dr. Keisling testified about the March 10, 2000 letter the

---

11. Dr. Binks noted that Dr. Kelley, who was the medical director at John Howard Pavilion at the time, credited Mr. Hinckley's description of the incident. *See* Tr., Vol. I at 88 (Dr. Binks). In his testimony during the 1997 hearing, however, Dr. Kelley noted that another doctor at the Hospital, Dr. Teagarden, did not. *See* Defendant's Exh. 6 at 238.

Hospital received from the Secret Service describing certain books Mr. Hinckley had examined while on "B" city outings that included trips to four bookstores in August, September, October and December 1999. *See* Secret Service Letter at 2–3; Tr., Vol. I at 75–76 (Dr. Binks).[12] The books included: *Assassins; A Place Called Waco—A Survivor's Story; Dutch—Memoirs of Ronald Reagan; Live by the Sword—The Secret War Against Castro and the Death of JFK;* and two books on General Custer. Secret Service Letter at 2–3. According to the Secret Service, Mr. Hinckley also picked up a compact disc of the group "Dead Kennedys," showed it to Ms. DeVeau and laughed. *Id.* at 3. The treatment team concluded that Mr. Hinckley's examination of these materials was not clinically significant. *See* Tr., Vol. I at 81 (Dr. Binks). After these incidents, Dr. Binks discussed Mr. Hinckley's reading with him and made him prepare a list of what he had read. *See* Tr., Vol. I at 58 (Dr. Binks). The reading list produced by Mr. Hinckley included books on Hitler, the militia and Ezra Pound among many others. *See* Tr., Vol. IIa at 51 (Dr. Keisling). Dr. Binks and other members of the treatment team did not believe that what Mr. Hinckley had read was clinically significant. *See* Tr., Vol. I at 73 (Dr. Binks); *see also* Stathas Rep. at 7–8. Dr. Keisling concurred with the Hospital's conclusion that the list of reading material prepared by Mr. Hinckley in 2000 did not indicate a return of his previous obsessiveness and that Mr. Hinckley's explanations of his interest in

the books was reasonable. *See* Tr., Vol. IIa at 52–53.

With respect to the 2000 revelation of the Jodie Foster book purchased by Ms. DeVeau, Dr. Keisling does not believe that Mr. Hinckley's failure to inform the treatment team about the existence of the book for five days constituted evidence of evasiveness, deceptiveness or dangerousness. It did, however, indicate poor judgment; he should have told someone promptly. *See* Tr., Vol. IIa at 129–30 (Dr. Keisling).[13] Dr. Keisling has talked at length with Mr. Hinckley about Ms. Foster, and he believes Mr. Hinckley's denial of any current interest in her. *See* Tr., Vol. IIa at 61 (Dr. Keisling). Both Dr. Keisling and Dr. Binks believe there is no evidence that Mr. Hinckley is now fixating on, or obsessing about, Ms. Foster. *See* Tr., Vol. I at 119 (Dr. Binks); Tr., Vol. IIa at 61 (Dr. Keisling). Indeed, Dr. Binks testified that, although Mr. Hinckley and he have discussed Jodie Foster a number of times over the years Dr. Binks has been treating him, the issue is sufficiently insignificant that it is referenced only once in his over 700 pages of notes on sessions he has had with Mr. Hinckley. *See* Tr., Vol. I at 119–20 (Dr. Binks).

Mr. Hinckley, though once both an avid reader and a prolific writer, stopped writing completely about five years ago. He has also severely curtailed his once broad reading habits, now focusing almost completely on books about cats, newspapers and magazines. *See* Tr., Vol. I at 124–25

---

**12.** Mr. Hinckley did not buy any of the books and did not open many of them.

**13.** Dr. Binks testified that Ms. DeVeau bought the book in 1996, but did not bring this fact to Mr. Hinckley's attention until 1999 or 2000 just before his hearing on conditional release. Ms. DeVeau, not Mr. Hinckley, told the treatment team about this. This failure of Mr. Hinckley to disclose the matter to his treat-

ment team led the Hospital to withdraw its 2000 request for conditional release. *See* Tr., Vol. I at 84 (Dr. Binks). According to the Stathas Report, Ms. DeVeau purchased the book in 1998, told Mr. Hinckley about her purchase in May 2000, and Mr. Hinckley knew about the book for five to seven days before telling his treatment team. *See* Stathas Rep. at 1–3.

(Dr. Binks). Dr. Binks believes that Mr. Hinckley now is very careful about what he reads because he is worried about misperceptions about his reading interests and the possibility that they could be misconstrued. He characterizes Mr. Hinckley's shift in interest as "healthy and adaptive," not "deceptive." Tr., Vol. I at 202 (Dr. Binks).

Dr. Keisling concedes that there is always going to be some risk of dangerousness because of the violent nature of Mr. Hinckley's conduct in the past, but he is of the opinion that so long as Mr. Hinckley's psychosis is in remission he will not pose a danger to himself or others. See Tr., Vol. IIa at 23–24, 38, 128 (Dr. Keisling). Dr. Keisling agrees that it is important that Mr. Hinckley remain under supervision; while the likelihood of danger under the proper conditions is low, he must be supervised and returned to the Hospital if there is any sign of relapse. See Tr., Vol. IIa at 38 (Dr. Keisling). Dr. Binks is "confident that there will not be a deterioration" in Mr. Hinckley's condition while on conditional release; if there were a deterioration, it would occur over a period of months or years. Tr., Vol. I at 56 (Dr. Binks). Dr. Keisling agrees that the likelihood of deterioration is low and that any deterioration would occur over a matter of weeks or months. See Tr., Vol. IIa at 24 (Dr. Keisling). The chance that Mr. Hinckley would "decompensate" over a 48–hour period is almost non-existent. See Tr., Vol. IIa at 25 (Dr. Keisling). Both doctors repeatedly reiterated their opinion that Mr. Hinckley would not be a danger to himself or others in the context of the conditional release proposed by the Hospital.

## 2. Government's Expert Witnesses

Dr. Robert Phillips and Dr. Raymond F. Patterson, both psychiatrists, testified for the government. Both experts concurred with the Hospital's position that Mr. Hinckley's psychotic disorder NOS and major depression are in full remission and that Mr. Hinckley is ready for limited conditional release to the supervision of his parents unsupervised by Hospital personnel. They indicated, however, that the August 5, 2003 proposal submitted by the Hospital was not "clinically appropriate" unless certain modifications were made and additional conditions were added. With these changes, both doctors support the conditional release of Mr. Hinckley for limited periods under the supervision of his parents. Dr. Patterson does not believe that the concerns that led him to oppose such a release in 1997 justify denying such release today. Both experts expressed the view, however, that Mr. Hinckley's conditional release under the conditions outlined in his Section 501(k) petition was not appropriate. See Phillips Rep. at 52; Patterson Rep. at 23.

Both Dr. Patterson and Dr. Phillips testified that narcissistic personality disorder is Mr. Hinckley's primary diagnosis at the present time and that he has suffered from it for over thirty years. See Tr., Vol. IIb at 34 (Dr. Phillips); Tr., Vol. III at 43 (Dr. Patterson). Dr. Phillips does not agree with the opinion of Mr. Hinckley's experts that the narcissistic personality disorder is completely divorced from his previously violent behavior. He contends that there is a relationship between psychosis and narcissism and believes that the narcissism was at least a contributing factor when Mr. Hinckley shot President Reagan. See Tr., Vol. IIb at 37 (Dr. Phillips).

Dr. Patterson noted that personality disorders, such as narcissistic personality disorder, are notoriously difficult to treat, and although it is possible to treat the symptoms, it is not really possible to treat the disorder itself. See Tr., Vol. III at 48 (Dr. Patterson). In Mr. Hinckley's case, the symptoms have included grandiosity, a

sense of self-importance, poor judgment, deceptiveness and a conscious screening of information. *See* Tr., Vol. III at 47 (Dr. Patterson); Phillips Rep. at 43–45, 50. Dr. Phillips and Dr. Patterson agree that Mr. Hinckley's deceptive tendencies are related primarily to his narcissistic personality disorder, not to his psychosis, and that he continues to have deceptive tendencies. *See* Tr., Vol. IIb at 38 (Dr. Phillips); Tr., Vol. III at 44 (Dr. Patterson). According to Dr. Patterson and Dr. Phillips, Mr. Hinckley also continues to have a sense of grandiosity and self-importance. *See* Tr., Vol. IIb at 38; Tr., Vol. III at 48–49 (Dr. Patterson); Phillips Rep. at 51. When Dr. Patterson questioned Mr. Hinckley about the media, for example, Mr. Hinckley said he "would always be a celebrity;" when Dr. Patterson pointed out that there was a difference between being a celebrity and a "notorious attempted assassin," Mr. Hinckley did not see the difference. Dr. Patterson opined that it is difficult for Mr. Hinckley to recognize how others see him, and that he has difficulty distinguishing between fame and infamy. *See* Tr., Vol. III at 48–49 (Dr. Patterson). Dr. Phillips testified that Mr. Hinckley's behavior in 1999 in the bookstores while on "B" city outings, even if not inappropriate, indicated a lack of judgment, particularly since he was under such close scrutiny during his initial visits off Hospital grounds. Such a lack of judgment also may be indicative of narcissistic behavior. *See* Tr., Vol. IIb at 43–44 (Dr. Phillips); *see also* Tr., Vol. III at 58 (Dr. Patterson).

While both Dr. Phillips and Dr. Patterson expressed concern about Mr. Hinckley's deceptive tendencies, Dr. Phillips alone among the experts believes that recent and perhaps current deceptive behav-

ior of Mr. Hinckley and his efforts to "hide the ball" from the treatment team are particularly relevant in assessing the current proposals for conditional release. *See* Tr., Vol. IIb at 39 (Dr. Phillips). Although the passage of time may attenuate the weight to be accorded to it, deception remains a significant concern for Dr. Phillips. *See* Tr., Vol. IIb at 38 (Dr. Phillips). Dr. Phillips believes Mr. Hinckley's history of deception is particularly relevant because conditional release puts a patient in a less secure, less protective environment, and that may make it more likely that the patient will experience the same types of stresses which caused the original onset of his conditions. *See* Tr., Vol. IIb at 39 (Dr. Phillips). During his testimony, Dr. Phillips enumerated a number of instances in which he felt that Mr. Hinckley had been deceptive in the recent past.[14]

First, when Dr. Phillips inquired about Mr. Hinckley's reading habits during his 2000 examination of him, Mr. Hinckley downplayed the nature of his reading materials and gave no indication that the materials were at all objectionable. *See* Tr., Vol. IIb at 47 (Dr. Phillips). Dr. Phillips found it very significant that Mr. Hinckley included books in the list he later provided to the Hospital which he had not revealed to Dr. Phillips. *See* Tr., Vol. IIb at 45–47 (Dr. Phillips). Second, Dr. Phillips questioned why Mr. Hinckley had failed to mention the Jodie Foster book purchased by Ms. DeVeau to him, even though its existence was soon to be disclosed by Ms. DeVeau. *See* Tr., Vol. IIb at 48 (Dr. Phillips). Both Dr. Patterson and Dr. Phillips found it troubling that Mr. Hinckley deliberately withheld this information from the treatment team and from Dr. Phillips, and Dr. Phillips believes that

---

**14.** Dr. Patterson, by contrast, concluded that issues regarding Mr. Hinckley's guardedness and deceptiveness do not contraindicate the Hospital's proposal. He noted that his inter- views revealed no evidence that Mr. Hinckley is currently being deceptive. *See* Tr., Vol. III at 97, 100 (Dr. Patterson).

this incident is directly connected to Mr. Hinckley's lack of forthrightness. *See* Tr., Vol. IIb at 37, 48–49 (Dr. Phillips); Tr., Vol. III at 58 (Dr. Patterson).

Third, Dr. Phillips indicated that during his examination of Mr. Hinckley, Mr. Hinckley indicated that his relationship with Ms. DeVeau had declined significantly and that they spoke infrequently by telephone. *See* Tr., Vol. II at 55–56 (Dr. Phillips). Dr. Phillips therefore was surprised to learn during the course of the evidentiary hearing that they spoke daily by telephone. *See* Tr., Vol. II at 56 (Dr. Phillips).[15] Dr. Phillips finds Mr. Hinckley's relationship with Ms. DeVeau clinically relevant because it was a very dependant relationship and any significant interpersonal relationship is of "paramount importance" when dealing with an insanity acquitee. *See* Tr., Vol. IIb at 57 (Dr. Phillips). He believes it therefore is necessary to get a clearer understanding of the nature of that relationship. *See* Tr., Vol. IIb at 57 (Dr. Phillips). Obtaining such an understanding is difficult since, in Dr. Phillips' view, Mr. Hinckley does not appear to be consistently sharing information about this relationship, and Ms. DeVeau has refused to be interviewed without her attorney present. *See* Tr., Vol. IIb at 60 (Dr. Phillips). Dr. Phillips considers it important to determine whether Mr. Hinckley's failure to tell him the same thing he has told the other professionals about his relationship with Ms. DeVeau is due to misperceptions by Dr. Phillips or whether Mr. Hinckley is purposely giving different answers to different doctors, indicating deceptiveness. *See* Tr., Vol. IIb at 62 (Dr. Phillips).

Finally, Dr. Phillips believes it may be significant that Mr. Hinckley has "seriously curtailed" the scope of his reading. *See* Tr., Vol. IIb at 63 (Dr. Phillips). What Mr. Hinckley chooses to read either may be unimportant or may have "profound importance" depending on its nature; it is difficult to know. *See* Tr., Vol. IIb at 62 (Dr. Phillips). Dr. Phillips testified that patients should not have to curtail their reading because of their concerns about misperceptions, as Mr. Hinckley says he has done. Instead, they should read whatever they wish, and if the material might be viewed as objectionable, they should discuss it with their doctors. *See* Tr., Vol. IIb at 63–64 (Dr. Phillips). Dr. Phillips notes that it was troubling that Mr. Hinckley was reading material as late as 2000 that could have been indicative of a resurgence of psychopathology and that the Hospital was not aware of it because Mr. Hinckley did not tell them. *See* Tr., Vol. IIb at 62 (Dr. Phillips).[16]

While there is no current evidence of delusional thinking and no current evidence of Mr. Hinckley's interest in Jodie Foster, Dr. Patterson believes that the Jodie Foster obsession remains clinically significant and must be kept in mind because it was an obsession with a fiction rather than with a real relationship and was directly related to Mr. Hinckley's psychosis and the assassination attempt. The obsession lasted at least until 1988, and Mr. Hinckley's continued denial of his interest throughout was evidence of his deception. Dr. Patterson, who was Director of Forensic Services at St. Elizabeths, acknowledged that he could not tell that Mr. Hinckley had been lying to him in 1988

---

**15.** Mr. Hinckley told all of the other doctors, including Dr. Patterson, that he and Ms. DeVeau still spoke daily.

**16.** Both Dr. Phillips and Dr. Patterson agreed that it is unfortunate that Mr. Hinckley has

stopped reading and writing because both reading and writing are windows into his mind, and now Mr. Hinckley's "blinds have been closed." Tr., Vol. IIb at 64 (Dr. Phillips); *see also* Tr., Vol. III at 59 (Dr. Patterson).

when Mr. Hinckley denied having requested a nude caricature of Jodie Foster. *See* Tr., Vol. III at 53–56 (Dr. Patterson).

The 1995 incident involving Commander Wick continues to give Dr. Patterson pause because of its disturbing resemblance to Mr. Hinckley's pattern of behavior with respect to Jodie Foster prior to the assassination attempt. As with Ms. Foster, in Dr. Patterson's view, this was not merely an infatuation without seriousness or import. Dr. Patterson disagrees with the Hospital doctors who credited Mr. Hinckley's version of the events over that of Commander Wick, who described Mr. Hinckley's conduct as closely akin to stalking. Although Dr. Patterson noted that Mr. Hinckley described incidents with respect to Commander Wick which, in Dr. Patterson's opinion, never occurred, he does not believe that Mr. Hinckley's behavior with respect to Commander Wick rose to the level of delusion; rather, it was inappropriate behavior and demonstrated poor judgment. *See* Tr., Vol. III at 64–69 (Dr. Patterson); *see also* Patterson Rep. at 19 ("[t]here is no overt evidence in his presentation of delusional thinking or hallucinatory activity"). Still, the Wick incident raises concerns for Dr. Patterson because he does not share Dr. Keisling's view that it would be readily apparent were Mr. Hinckley to descend once again into delusional thinking. There were no overt signs of delusion or psychosis at the time of the attempt to assassinate President Reagan either, and Dr. Patterson believes that although the obsessive behavior with respect to Commander Wick did "not reach[ ] delusional proportions … it was on its way." *See* Tr., Vol. III at 68–69 (Dr. Patterson).

Despite their concerns, Dr. Phillips and Dr. Patterson support conditional release at this time. They agree with the other professionals that there has been "clinically significant improvement" in Mr. Hinck-

ley since 2000 and that Mr. Hinckley has been much less deceptive and more forthright with his treatment team and other clinicians. Tr., Vol. III at 20 (Dr. Phillips); *see also* Tr., Vol. III at 105 (Dr. Patterson); Phillips Rep. at 51. Dr. Patterson, who opposed conditional release in 1997, concludes that Mr. Hinckley's current levels of defensiveness and lack of forthrightness "do not appear to contraindicate the [Hospital's] request as stated in their letter of August 5, 2003, (with suggested modifications)." Patterson Rep. at 22. Dr. Phillips concurs: "[T]here is no clinical evidence contained in his record or revealed through collateral clinical interviews that would preclude the advancement of privileges to include limited conditional release in the custody of his parents and unsupervised by hospital staff." Phillips Rep. at 54. It is the opinion of both doctors that "at the present time Mr. Hinckley does not pose a danger to himself or others and could engage in a stepwise manner with increasing degrees of freedom under his parents' supervision in the community without posing a significant risk if he strictly adheres to a well tailored plan and concretely defined conditions of release." Phillips Rep. at 54; *see also* Patterson Rep. at 22.

3. Concerns About Hospital's August 2003 Section 501(e) Proposal

In August 2003, Dr. Phillips and Dr. Patterson, having been engaged by the government as expert consultants, prepared written reports, later submitted to the Court by the government, which outlined their concerns about and suggested modifications to the Hospital's Section 501(e) proposal. They reiterated many of these concerns and suggestions during their testimony at the evidentiary hearing. As noted, both support the conditional release of Mr. Hinckley under the supervision of his parents without the presence of Hospital personnel. They believe, howev-

er, that the Hospital's August 2003 proposal "lacked sufficient detail and clinical specificity concerning the conditions of release." Phillips Rep. at 52; *see also* Patterson Rep. at 22.

Dr. Phillips and Dr. Patterson viewed the Hospital's release proposal as a three step proposal. Phase I would consist of day visits in the Washington, D.C. area, that is, within a 50–mile radius of Washington. Phase II would be overnight visits with his parents in the Washington, D.C. area. Phase III would be overnight visits at the parents' home some distance from the Washington, D.C. area. *See* Tr., Vol. III at 80 (Dr. Patterson). In the view of Dr. Phillips and Dr. Patterson, Mr. Hinckley would have to demonstrate good results from each visit in any given phase before a subsequent visit and then a subsequent phase would be appropriate; Dr. Patterson insists that there be clear planning and review at every phase. *See* Tr., Vol. III at 75–76 (Dr. Patterson). Dr. Phillips stressed the need for a relapse prevention plan outlining factors that would help identify a risk of "decompensation." Phillips Rep. at 53.[17] Dr. Patterson testified that the Review Board should be involved in the planning process to assure that there will be a clinically detached review of the treatment team's proposal. *See* Tr., Vol. III at 83–84 (Dr. Patterson).

Dr. Phillips recommended that Ms. DeVeau should be excluded from the visits as a risk management measure. He also thought it should be made clear that Mr. Hinckley's parents were supervising the outings, not just accompanying him. *See* Phillips Rep. at 52; Tr., Vol. IIb at 82 (Dr. Phillips). He indicated that all media contact should be prohibited and that there should be a response plan regarding unwanted media contact. *See* Phillips Rep. at 52; Tr., Vol. IIb at 77 (Dr. Phillips). In the context of Mr. Hinckley's narcissism, Dr. Phillips believes that anything that draws attention to Mr. Hinckley is counter-therapeutic. *See* Tr., Vol. IIb at 78 (Dr. Phillips).[18]

Dr. Phillips stressed that the Hospital should "thoroughly assess the success of the time-limited conditional release day passes under specialized conditions before entertaining overnight visits." Phillips Rep. at 52. More formal feedback is necessary because of Mr. Hinckley's defensiveness and guardedness. *See* Tr., Vol. III at 51–52 (Dr. Patterson). Dr. Patterson added that the local day visits should be reviewed by the treatment team with Mr. Hinckley and with his parents after each visit and that the Review Board should hear a presentation by the treatment team prior to granting any overnight visits. *See* Patterson Rep. at 22.

Dr. Phillips does not have any concerns at present that would prevent local, daytime visits supervised by Mr. Hinckley's parents with appropriate conditions. *See* Tr., Vol. III at 27 (Dr. Phillips). For more extended outings, however, he believes that Mr. Hinckley must demonstrate success in Phase I before overnight visits with his parents are appropriate, even in the Washington, D.C. area. Successful Phase I visits would put Mr. Hinckley in a position to have his situation reviewed, and, if appropriate, then be approved for Phase II outings. *See* Tr., Vol. III at 26 (Dr. Phil-

17. Dr. Phillips also indicated that the Hospital should outline the therapeutic goals for the outings, *see* Phillips Rep. at 53, and that the plan should be looking forward to eventual integration with the community rather than just spending time away from the Hospital. *See* Tr., Vol. IIb at 70 (Dr. Phillips).

18. Dr. Keisling agreed that media contact would be inappropriate, *see* Tr., Vol. IIa at 93 (Dr. Keisling), and Dr. Binks testified that the Hinckleys have a plan to avoid media contact on the outings. *See* Tr., Vol. I at 57 (Dr. Binks).

lips). Dr. Phillips' testimony is clarified by his report, which noted that the Hospital should "thoroughly assess the success of the time-limited conditional release day passes under specialized conditions before entertaining overnight visits." Report of Dr. Robert Phillips, Government's Exh. 2. at 52.

With respect to trips outside of the Washington, D.C. area, Dr. Phillips stated that, in his view, "no unaccompanied trips" to the Hinckleys' home should take place until a local mental health professional is identified and has incorporated himself or herself into the treatment process and is available for acute intervention should such intervention be necessary. Phillips Rep. at 53–54. See Tr., Vol. II at 85 (Dr. Phillips). Dr. Patterson stressed that the treatment team's presentation should specify the security and supervision to be provided for any overnight visits because overnight visits require additional safeguards. See Patterson Rep. at 22; Tr. Vol. II at 84. He generally agreed that Dr. Phillips' proposal with regard to overnight visits to the Hinckleys' home were "sound recommendations." Tr., Vol. III at 82 (Dr. Patterson). Finally, Dr. Patterson stated that it was "essential" that Mr. Hinckley continue to receive psychotropic medication if any of the proposed conditional release visits were permitted. See Patterson Rep. at 22.

Dr. Binks agreed that the Hospital should create an itinerary prior to each visit and that the day visits would be routinely reviewed. Neither he nor Dr. Keisling, however, felt that it was necessary for the treatment team to report to the Review Board before the overnight visits commenced. See Tr., Vol. I at 97, 103 (Dr. Binks); Tr., Vol. IIa at 82 (Dr. Keisling). Dr. Keisling testified that the pace of advancement should be within the discretion of the treatment team. See Tr., Vol. IIa at 84–85 (Dr. Keisling). Both doctors reiterated that the Hospital can terminate a conditional release at any time. See Tr., Vol. IIa at 83 (Dr. Keisling). Dr. Binks agreed that there was a need to specify the supervision and security measures prior to the visits and that the Hospital would do so. See Tr., Vol. I at 98 (Dr. Binks). Dr. Binks and Dr. Keisling agreed that Ms. DeVeau should not be a part of any of the outings. See Tr., Vol. I at 106 (Dr. Binks); Tr., Vol. IIa at 87, 91 (Dr. Keisling).[19] Neither Dr. Binks nor Dr. Keisling believes that it is necessary to have in place a local mental health professional near the parents' home until such time in the future as the visits are of a longer duration than those currently proposed; in their view, the relapse prevention plan is sufficient for risk management. See Tr., Vol. I at 109–10 (Dr. Binks); Tr., Vol. IIa at 94 (Dr. Keisling). Dr. Binks indicated that Mr. Hinckley's parents would be very responsible caretakers. See Tr., Vol. I at 52 (Dr. Binks).[20]

**19.** The Hospital itself, however, was not willing to prohibit all contact with Ms. DeVeau during the outings. See Tr., Vol. IV at 84 (Dr. Montalbano); Nov. 25, 2003 Letter.

**20.** Mrs. Hinckley testified that she and Mr. Hinckley, Sr. have been on successful "B" City outings with Mr. Hinckley. See Tr., Vol. II at 5–6. He has never been recognized or approached when with his parents. See Tr., Vol. II at 6. They plan to let the treatment team know about their plans and to work with the treatment team to develop an itinerary for the visits. See Tr., Vol. II at 7–8. They will use the forms developed by Dr. Binks and will carry a phone list with emergency numbers and a cell phone at all times. See Tr., Vol. II at 9–17. Mrs. Hinckley believes that her son is no longer mentally ill and is not dangerous. See Tr., Vol. II at 19. She admitted that she and her husband have not discussed with the treatment team what they will do if Mr. Hinckley simply gets angry and leaves the room. See Tr., Vol. II at 20–21.

## B. The Revised Section 501(e) Proposal and Dr. Montalbano's Testimony

After the government's experts had concluded their testimony, the Court expressed its concern that, aside from Dr. Binks, no one from the Hospital had offered any opinion on the matter since its August 5, 2003, letter to the Court, which was written prior to the Hospital receiving the reports of Dr. Phillips and Dr. Patterson.[21] No one from the Review Board or the Hospital's legal advisor, the Office of the Corporation Counsel, had been present at the hearing. The Court's concerns were conveyed to the Hospital, which, at the direction of the Court, reviewed both the reports and the testimony of Dr. Phillips and Dr. Patterson and then convened an emergency meeting of the Review Board on November 24, 2003. The emergency meeting resulted in the submission of a second letter to the Court, dated November 25, 2003, which laid out a more detailed approach to the conditional release proposed by the Hospital in its August 5, 2003 letter and incorporated many of the modifications suggested by Dr. Phillips and Dr. Patterson.

The revised proposal recommends the same visits as the August 5, 2003 proposal, but with additional conditions. The proposal defines the conditional release for Mr. Hinckley as consisting of three phases. Phase I would consist of local day visits with his parents within a 50–mile radius of the Washington, D.C. area. Phase II consists of two local overnight visits with his parents within a 50–mile radius of the Washington, D.C. area. Phase III consists of six overnight visits at the parents' home outside the Washington, D.C. area. A detailed itinerary is to be developed by the Hospital and submitted to the Court under

seal two weeks prior to each outing. The Hospital noted that after every outing a status report would be sent to the Court under seal, and that a Review Board meeting evaluating the visits would be held between Phase II and Phase III. *See* Nov. 25, 2003 Letter.

The Hospital indicated that it will require Mr. Hinckley's parents to sign an agreement to assume supervisory control of Mr. Hinckley as well as a media plan that would prohibit any media contact. Mr. Hinckley and his parents will fill out relapse prevention plan feedback forms after each visit containing a list of factors that have been identified as relevant warning signs for decompensation in Mr. Hinckley's case. Mr. Hinckley and his parents also will be interviewed by treatment team members after each outing. If Mr. Hinckley violates the conditions of the release, he will immediately be returned to total inpatient care and the Court will be notified. *See* Nov. 25, 2003 Letter.

When the hearing reconvened on November 26, 2003, counsel for Mr. Hinckley called Dr. Paul Montalbano, the author of the psychological risk assessments, as a rebuttal witness. Dr. Montalbano is the Pretrial Chief of Forensic Services at the Hospital and is a member of the Review Board. He is authorized to speak on behalf of the Hospital. Dr. Montalbano has never been a member of Mr. Hinckley's treatment team. *See* Tr., Vol. IV at 12 (Dr. Montalbano).

Dr. Montalbano testified that his first risk assessments, in 1999, were intended to determine whether it was appropriate for Mr. Hinckley to have "B" city privileges and whether he was ready for a limited conditional release into the community un-

---

**21.** Dr. Patterson had previously expressed concern that no one from the Hospital other than Dr. Binks was scheduled to testify at the hearing. *See* Tr., Vol. III at 52. He said that he would have expected to have heard from the clinical administrator, the treating psychiatrist, or a member of the Review Board. Tr., Vol. III at 52.

der the supervision of his parents. *See* Tr., Vol. IV at 11–12 (Dr. Montalbano). Dr. Montalbano concluded in 1999 that Mr. Hinckley would not pose a danger either in "B" city visits or in structured, time-limited visits with his parents because he was no longer psychotic, depressed or suicidal and had not been for many years. *See* Tr., Vol. IV at 13, 28, 30–31 (Dr. Montalbano). The 2003 risk assessments were conducted once again with the intention of determining whether a limited conditional release under the supervision of Mr. Hinckley's parents was appropriate. *See* Tr., Vol. IV at 32 (Dr. Montalbano). Dr. Montalbano again concluded that Mr. Hinckley would not pose a danger to himself or others in this context. *See* Tr., Vol. IV at 32 (Dr. Montalbano).

Dr. Montalbano testified that there currently is no evidence of major depression or psychosis, Mr. Hinckley's primary risk factors. *See* Tr., Vol. IV at 38 (Dr. Montalbano). He indicated that Mr. Hinckley's narcissism is "attenuated." *See* Tr., Vol. IV at 38 (Dr. Montalbano). He noted that Mr. Hinckley is showing a capacity for intimacy and empathy and a lessening in his sense of entitlement and self-importance. *See* Tr., Vol. IV at 38 (Dr. Montalbano). Mr. Hinckley's intense self-absorption is "gone or virtually gone," and there is no evidence of delusional thinking. Tr., Vol. IV at 30. Dr. Montalbano concedes that Mr. Hinckley's guardedness and tendency to portray himself in a more favorable light raise concerns in the context of a conditional release, but notes that in response the Hospital has designed "more comprehensive, tighter risk management plans" just in case he is concealing something. *See* Tr., Vol. IV at 49 (Dr. Montalbano). Dr. Montalbano believes that there is a low risk of Mr. Hinckley decompensating during the course of a conditional release. Because of the high profile nature of the case, however, and in consideration of the number of stressors that Mr. Hinck-

ley may not be able to control, the Hospital, out of an abundance of caution and because of Mr. Hinckley's guardedness, is treating this low risk case as though it were a high risk conditional release case. *See* Tr., Vol. IV at 89 (Dr. Montalbano). Dr. Montalbano acknowledged Mr. Hinckley's long history of deceptiveness and believes his deceptiveness is related primarily to his narcissism but that he was more deceptive when he was depressed and/or delusional. *See* Tr., Vol. IV at 108 (Dr. Montalbano).

Although there is some degree of risk related to Mr. Hinckley's narcissism, Dr. Montalbano testified that it was the presence of the primary risk factors caused by the psychosis and depression (now in remission)—delusional thinking, depression and intense self-absorption—that correlated with the assassination attempt. *See* Tr., Vol. IV at 53 (Dr. Montalbano). Dr. Montalbano agreed with Dr. Binks and Dr. Keisling that it would be "very very hard to consistently conceal a major psychotic disorder or major depressive disorder for years and years." *See* Tr., Vol. IV at 55 (Dr. Montalbano). Dr. Montalbano did agree with the government, however, that Mr. Hinckley has been deceptive when not delusional and not in the throes of a major depressive episode. Dr. Montalbano noted that although the deception is related to all of his disorders, Mr. Hinckley is not deceptive to the same degree when his Axis I disorders are in remission as they have been for many years. *See* Tr., Vol. IV at 108 (Dr. Montalbano). Although Dr. Montalbano acknowledges that immediately prior to the assassination attempt, Mr. Hinckley was not displaying overt psychotic behavior, he notes that Mr. Hinckley is now observed constantly and that his cumulative behavior now is significantly different from his cumulative behavior at the time. *See* Tr., Vol. IV at 173 (Dr. Montalbano).

Dr. Montalbano does not agree with the statement that Mr. Hinckley is no more dangerous than anyone else. He noted that no one with Mr. Hinckley's history of violence, who engaged in stalking behavior for years and who attempted suicide four times—even though the violent conduct and the suicide attempts occurred more than twenty years ago—is no more dangerous than anybody else. *See* Tr., Vol. IV at 187 (Dr. Montalbano). He concluded, however, that under the conditions as proposed in the Hospital's November 25, 2003 letter, Mr. Hinckley will not be dangerous to himself or others. *See* Tr., Vol. IV at 204 (Dr. Montalbano).

## IV. FINDINGS OF FACT

Based upon the testimony and exhibits offered by the government and counsel for petitioner, the Court finds that the following facts have been established by a preponderance of the evidence:

1. Mr. Hinckley's current diagnosis is psychotic disorder not otherwise specified (Axis I), in remission; major depression (Axis I), in remission; and narcissistic personality disorder (Axis II).

2. Mr. Hinckley's Axis I diagnoses have been in remission for at least ten, and perhaps as many as sixteen years.

3. Mr. Hinckley's narcissistic personality disorder is significantly attenuated from its previous state. Mr. Hinckley continues to exhibit symptoms of grandiosity and self-importance, but no longer exhibits the intense self-absorption which was present during the 1980s.

4. Mr. Hinckley has exhibited no evidence of delusional thinking for approximately fifteen years and no evidence of obsessive conduct for at least eight years.

5. Mr. Hinckley has continued to exhibit deceptive behavior even when there have been no symptoms of psychosis or depression.

6. Mr. Hinckley continues to be guarded and defensive. As recently as three years ago, he exercised poor judgment in failing to convey relevant information to his treatment team.

7. Mr. Hinckley's self-reporting underrepresents his problems and pathology due to a tendency to minimize problems and to present himself in an overly positive light.

8. Mr. Hinckley has exhibited no violent behavior, nor attempted suicide, in over 20 years.

9. Mr. Hinckley has never tried to escape from the Hospital or when on "B" city outings and has not violated any of the conditions mandated by the privileges he currently enjoys. He has successfully participated in over 200 Hospital-accompanied outings in the community without incident.

10. Were Mr. Hinckley to experience a relapse of his Axis I disorders, that relapse would not occur suddenly, but rather would occur gradually over a period of at least weeks or months. A relapse would not occur during the course of a 48–hour conditional release.

11. Mr. Hinckley self-medicates with 1mg of Risperdal per day. There is no indication that Mr. Hinckley has failed to take his medication in the recent past. Were Mr. Hinckley to cease to take his medication over the course of a 12 or 36 hour visit, it would have no physiological effect.

12. So long as Mr. Hinckley's psychosis and depression are in remission, he will not pose a danger to himself or others under the conditions proposed by the Hospital and the government's experts.

13. The experts who testified all expressed the opinion to a reasonable degree of medical certainty that under the conditions proposed by the Hospital and the government's experts, Mr. Hinckley will not be a danger to himself or others in the context of Phase I visits. The experts also concluded that if the Phase I visits were thoroughly reviewed by the professionals at the Hospital and the Hospital determined that Phase II visits were appropriate, Mr. Hinckley will not be a danger to himself or others in the context of Phase II visits.

On the ultimate mixed question of law and fact, dangerousness, the Court finds that under the conditions proposed by the Hospital and the government's experts, Mr. Hinckley will not in the reasonable future be a danger to himself or others in the context of the Phase I and Phase II visits.

## V. DENIAL OF MR. HINCKLEY'S SECTION 501(k) PETITION

■ When Mr. Hinckley petitioned for conditional release in the custody of his parents unsupervised by Hospital personnel in 1997, Judge Green noted that "the request for conditional release has not come from the Hospital, but from the Petitioner and that the Hospital has, in fact, denied a similar request made by the Petitioner." *United States v. Hinckley*, 967 F.Supp. at 559. Today, the Hospital and the majority of the expert witnesses agree that Mr. Hinckley's current Section 501(k) proposal is clinically inappropriate. This Court sees no reason to disagree with the opinions of the medical professionals. Mr.

Hinckley's motion for limited conditional release under Section 501(k) therefore is denied.

## VI. RULING ON HOSPITAL'S SECTION 501(e) PROPOSAL

■ In contrast to Mr. Hinckley's petition, the proposal offered by the Hospital under Section 501(e) is supported by every medical expert who testified at this hearing. As the court of appeals has noted, it may be appropriate for the district court to deny a conditional release even when all of the expert witnesses concur that the risk of danger to the community is minimal. *United States v. Ecker*, 543 F.2d at 190. This is because the issue of dangerousness is a mixed question of law and fact, and "the court is under no obligation to accept the experts' opinions on questions of law." *Id.* In deciding whether to grant conditional release, the Court is required to make an independent determination based on all the evidence in the case, not just the views of the experts. *Id.* Should the Court deny release in the face of uncontradicted expert testimony, the denial must be based on the evidence in the case and not merely on the arbitrary substitution by the Court of its own opinion. *Id.* at 185 n. 20.

The primary concerns expressed by Dr. Phillips and Dr. Patterson related to Mr. Hinckley's history of delusional and deceptive behavior. Despite the lack of any affirmative evidence of current or recent delusional behavior, there is some evidence of continuing deceptive behavior. For that reason, Dr. Patterson's testimony that the onset of psychotic thinking would not necessarily be readily observable gives the Court pause. The Court is concerned about Mr. Hinckley's history of deceptive behavior, and the effect that such behavior, if it continues to this day, might have

on the treatment team's ability to accurately assess Mr. Hinckley's current level of dangerousness. Despite this concern, however, there is no reasonable expectation that Mr. Hinckley will relapse within a 48–hour or even substantially longer period.

Every expert who testified, however, was in full command of Mr. Hinckley's background and test results and was well aware of the concerns just noted by the Court. Yet all of them—not only Mr. Hinckley's expert witnesses, but also the expert witness retained by the government—have expressed their opinion that under a highly structured, limited conditional release, Mr. Hinckley will, to a reasonable medical certainty, not be a danger to himself or others. They all support local, daytime visits and local overnight visits under the supervision of his parents.[22] Significantly, this was true even of Dr. Patterson, who in 1997 opposed a similar request for conditional release.

A greater level of concern was expressed by the government's experts in connection with the Phase III overnight visits to the parents' home outside the Washington, D.C. area. Although the experts did conclude that such visits, if properly planned, were not necessarily clinically inappropriate, the experts' overall concerns regarding planning and risk assessment are shared by the Court. Insufficient evidence has been presented that would allow the Court to conclude, by a preponderance of the evidence, that the added risks entailed in leaving the immediate vicinity of the situs of the Hospital have been addressed to the Court's satisfaction. The Court is unable to conclude that Mr. Hinckley, under the proposed conditions of the Phase III release, would not be a danger to himself or oth-

ers in large part because of both the lack of specificity and the lack of planning with respect to Phase III. Furthermore, the Court itself would want to have before it all relevant information with respect to the details of and the success (or lack of success) of the Phase I and Phase II visits before determining whether visits outside the Washington, D.C. area, and under what specific conditions, would be appropriate. Phase III of the Hospital's proposal therefore is denied.

■ With respect to the Phase I and Phase II proposals, the Court concludes that under the conditions specified in the Hospital's November 25, 2003 letter, as well as certain other conditions proposed by the government's experts, Mr. Hinckley will not be a danger to himself or others. The specific conditions the Court thinks necessary and that will be required are outlined below and specified in the Order that accompanies this Opinion.

In 2000, the Hospital proposed only local day visits; now, as the government pointed out in its cross-examination of Dr. Montalbano, the proposal includes only two local day visits and then two local overnight visits, followed immediately by six overnight visits at the parents' home outside the Washington, D.C. area. As the Court already has stated, it remains unconvinced that such rapid progression to overnight visits outside the Washington, D.C. area is appropriate and will not allow them. The Court also is unconvinced of the wisdom of progressing so rapidly to local overnight visits after the Hospital will have received feedback from only two unsupervised local day visits. The Court believes it would be much more prudent for Mr. Hinckley first to complete six local, unsupervised day visits, and for those visits to be fully ana-

---

**22.** Dr. Phillips cautions that the local day visits must be thoroughly assessed before lo-

cal overnight visits are approved.

lyzed and presented to the Review Board, before any overnight visits take place. It is essential in a case such as this, where all of the experts have emphasized the importance of collateral evidence in the assessment of Mr. Hinckley's mental condition and risk factors, that there be ample evidence of success in less structured settings when Mr. Hinckley is under the supervision of his parents prior to attempting overnight visits. The Court also has some concerns about the age of Mr. Hinckley's parents and their ability to function as responsible parties should Mr. Hinckley choose to act contrary to the terms and conditions of any release. Requiring six local 12–hour day visits before any overnight visits are permitted will give the Hospital sufficient information to determine whether such concerns are significant or unjustified.

As the government experts explained, the *conditions* of the release are vitally important in determining whether release is appropriate. Detailed logistical planning is necessary to keep risk low and to be certain in advance of any release that the release will occur in a very controlled environment. Likewise, detailed post-release review is necessary after each outing to let the Hospital know what transpired and how to deal with any unforeseen problems with the release that may have occurred. Even though every expert concurs that Mr. Hinckley is clinically ready for overnight visits in the Washington, D.C. area, the Court believes that the Hospital requires more feedback to adequately prepare for and schedule overnight visits than would be collected in only two local day visits.

Although the Court will approve Phase I and Phase II visits at this time, they are approved only if all of the following conditions are imposed. All of the conditions outlined in the Hospital's November 25, 2003 letter must be implemented. The

schedule will be changed, however, to reflect that Mr. Hinckley must first complete six local day visits successfully before two overnight visits in the Washington, D.C. area will be permitted. Mr. Hinckley will not be permitted any visits outside of the Washington, D.C. area. Both the day and the overnight visits must occur within a 50–mile radius of Washington, D.C.

Mr. and Mrs. Hinckley will sign and agree to the "Agreement to Assume Supervisory Responsibility for Patient while on Limited Conditional Release." If there are any signs of decompensation, no matter how slight, of danger to himself or others or of elopement, his parents must immediately return Mr. Hinckley to the Hospital. If there are any negative incidents regarding the public or the media, Mr. or Mrs. Hinckley will immediately call the Nursing Supervisor's Office at the Hospital and will return with Mr. Hinckley to the Hospital if so directed. Mr. Hinckley and his parents will sign and agree to adhere to the "Media Plan" which provides that any effort to contact the media, by either Mr. Hinckley or his parents, in person or by any other means while Mr. Hinckley is on conditional release will constitute a violation of the conditional release. If approached by the media, the Hinckleys will decline to speak with them, and if the media persists, the Hinckleys will withdraw. For the greatest likelihood of the success of these outings without disruption or public attention, the Court urges representatives of the media to suppress their normal and natural curiosity by leaving the Hinckleys alone and seeking no information from the Hospital or anyone else about the timing or details of the outings.

A detailed itinerary will be developed by the Hospital and submitted, under seal, to the Court two weeks prior to each outing with information regarding the locations,

purposes, therapeutic goals and time frames of the visit. That itinerary will also be provided to defense counsel and to government counsel. Because these visits are not covered by the 1987 stipulation, which required the Hospital to provide the Court and the government with at least two weeks' notice of any "B" city outing, this Opinion and the accompanying Order will serve to enforce the same regimen. Although the Court has made no presumption about the presence or absence of the Secret Service on these outings, this provision will allow the government to keep the Secret Service informed of Mr. Hinckley's movements if it so chooses. Mr. Hinckley and his parents will maintain phone contact with the Hospital at least once a day during each outing. Mr. Hinckley is not permitted to leave his parents' supervision at any time during the course of the conditional release.

After each outing, Mr. Hinckley's parents will provide the Hospital with a completed "Relapse Prevention Plan Feedback From Responsible Person Supervising Patient While On Conditional Release" form. Mr. Hinckley will fill out the "Relapse Prevention Plan Feedback From Patient While On Conditional Release" form within two hours of returning to the Hospital after each outing. The treatment team will interview Mr. Hinckley and his parents after each outing. The Hospital will write a detailed report following each visit and submit that report under seal to the Court. That report will likewise be provided to both counsel for the defense and counsel for the government.

Contrary to the current inclination of the Hospital, Mr. Hinckley will not be allowed any contact with Ms. DeVeau, either in person or through any other medium, during the course of the conditional release. The Court echoes the concerns raised by Dr. Phillips regarding the possibility of deception surrounding the rela-

tionship and the lack of clarity concerning its current nature. Any contact with Ms. DeVeau during a conditional release will be considered a violation of the conditional release, and Mr. Hinckley will be returned immediately to the Hospital. Likewise, Mr. Hinckley will continue to receive psychotropic medication during these activities, and any failure to self-medicate will be a violation of the conditional release.

If Mr. Hinckley completes six local day visits under the supervision of his parents successfully, and the treatment team believes that Mr. Hinckley has proved himself ready to undertake an overnight visit in the Washington, D.C. area under the supervision of his parents, the treatment team will make a presentation to the Review Board. That presentation will include a description of the security and supervision to be provided during the overnight visit. The Review Board will determine whether such expanded privileges are clinically appropriate. The Review Board will report its findings to the Court in writing under seal, along with an itinerary if the overnight visits are to go forward. The report and itinerary will also be provided to defense counsel and to counsel for the government. If the two overnight visits are approved by the Review Board, the Hinckleys will stay at a local hotel and will share one suite. Mr. Hinckley will not be permitted to leave the room unless accompanied by at least one parent. Just as on the day visits, Mr. Hinckley will not be permitted to leave his parents' supervision. Any attempt to do so would constitute a violation of his conditions of release.

Although the Court is acutely aware of and sensitive to the concerns raised by the government, the various individuals whose lives were changed by Mr. Hinckley's actions in 1981, and the general public, the Court concludes that it would not be legal-

ly sound under the statute and the case law to deny all aspects of the Hospital's request for conditional, time-limited outings under the supervision of his parents, where all of the evidence submitted to the Court weighs so heavily in favor of finding that Mr. Hinckley, under appropriate conditions as outlined in this Opinion, will not be a danger to himself or others.

An Order consistent with this Opinion will issue this same day.

SO ORDERED.

## ORDER

For the reasons stated in the Opinion issued this same day, it is hereby

ORDERED that Petitioner John W. Hinckley, Jr.'s petition under D.C.Code § 24–501(k) for limited conditional release is DENIED; it is

FURTHER ORDERED that St. Elizabeths Hospital's proposal for overnight visits outside of the Washington D.C. area (Phase III) under D.C.Code § 24–501(e) is DENIED; and it is

FURTHER ORDERED that St. Elizabeths Hospital's proposal for local day visits (Phase I) and local overnight visits (Phase II) in the Washington, D.C. area under D.C.Code § 24–501(e) is GRANTED subject to the following conditions:

1. Mr. Hinckley is being allowed a limited conditional release under the supervision of his parents. He is not permitted to leave his parents' supervision at any time during the course of the conditional release.

2. Mr. Hinckley will be allowed six local day visits within a 50–mile radius of Washington, D.C. (Phase I) and two 32–hour local overnight visits within a 50–mile radius of Washington D.C. (Phase II). The success of each visit will be thoroughly assessed by the Hospital before a subsequent visit is permitted. All six Phase I visits must be successfully completed before any Phase II visits take place.

3. A detailed itinerary will be developed by the Hospital and submitted, under seal, to the Court two weeks prior to each outing in Phase I and each overnight visit in Phase II with information regarding the locations, purposes, therapeutic goals and time frames of the visit. That itinerary also will be provided to defense counsel and to counsel for the government.

4. Mr. and Mrs. Hinckley will sign and agree to the "Agreement to Assume Supervisory Responsibility for Patient while on Limited Conditional Release."

5. Mr. Hinckley and his parents will maintain telephone contact with the Hospital at least once a day during each outing.

6. If there are any signs of decompensation or deterioration in Mr. Hinckley's mental condition, no matter how slight, of danger to himself or others, or of elopement, Mr. Hinckley will immediately be returned to the Hospital.

7. Mr. Hinckley and his parents will sign and agree to adhere to the "Media Plan" which provides that any effort to contact the media, either by Mr. Hinckley or by his parents, in person or by any other means while Mr. Hinckley is on conditional release, will constitute a violation of this conditional release. If approached by the media, the Hinckleys will decline to speak with them, and if the media persists, the Hinckleys will withdraw.

8. If there are any negative incidents regarding the public or the media, Mr. or Mrs. Hinckley will immedi-

ately call the Nursing Supervisor's Office at the Hospital and will return to the Hospital if so directed.

9. Mr. Hinckley will not be allowed any contact with Leslie DeVeau, either in person or through any other medium, during the course of the conditional release. Any contact with Ms. DeVeau will be considered a violation of Mr. Hinckley's conditional release, and Mr. Hinckley will be returned immediately to the Hospital.

10. Mr. Hinckley will continue to receive psychotropic medication during these activities, and any failure to self-medicate will be a violation of the conditional release and Mr. Hinckley will be returned immediately to the Hospital.

11. After each outing, Mr. Hinckley's parents will provide the Hospital with a completed "Relapse Prevention Plan Feedback From Responsible Person Supervising Patient While On Conditional Release" form.

12. Mr. Hinckley will fill out the "Relapse Prevention Plan Feedback From Patient While On Conditional Release" form within two hours of returning to the Hospital after each outing.

13. The treatment team will interview Mr. Hinckley and his parents after each outing. The Hospital will write a detailed report following each visit and submit that report under seal to the Court. That report will be provided to both counsel for the defense and counsel for the government.

14. If Mr. Hinckley successfully completes six local day visits under the supervision of his parents (Phase I), and the treatment team believes that Mr. Hinckley has proved himself ready to undertake an over-night visit in the Washington, D.C. area under the supervision of his parents, the treatment team will make a presentation to the Review Board. That presentation will include a description of the security and supervision to be provided during the overnight visit.

15. The Review Board will determine whether such expanded privileges are clinically appropriate. The Review Board will write a report of its findings and will submit the report, under seal, to the Court. The report also will be provided to defense counsel and to counsel for the government.

16. If the two Phase II overnight visits are approved by the Review Board, the Hinckleys will stay at a local hotel, and Mr. Hinckley and his parents will share one suite. Mr. Hinckley will not be permitted to leave the suite unless accompanied by at least one parent. Mr. Hinckley will not be permitted to leave his parents' supervision. Any attempt to do so would constitute a violation of his conditions of release.

17. Should Mr. Hinckley fail to adhere to any of the conditions of release imposed on him by this Order, this conditional release will be terminated immediately.

SO ORDERED.